## DIVISION OF HOWARD COUNTY.

1. LEGISLATIVE RECORDS; *Journals, and Enrolled Bills.* The legislative journals and the enrolled bills are the only records required by the constitution and laws to be kept for the purpose of showing any of the legislative proceedings; and hence, they must import absolute verity, and be conclusive proof as to whether any particular bill has passed the legislature, when it passed, how it passed, and whether it is valid or not. The engrossed bills of the two houses are not required to be made records, nor portions of any record. Therefore, where the legislative journals and the enrolled bill of a particular act of the legislature apparently show that the bill was regularly passed by the legislature, signed by the proper officers of each house, signed and approved by the governor, and filed in the office of the secretary of state, as an enrolled law, it will be held that such enrolled bill is valid and conclusive evidence of the law as contained in said bill, notwithstanding it may appear from an engrossed bill of the house, (not contained in the journal of either house,) and other extrinsic evidence, that a mistake was made in enrolling said bill, and that the enrolled bill omitted one important section, which was contained in the bill as it passed the two houses.

2. COURTS; JUDICIAL NOTICE; *Published Laws; Enrolled Bills; Journals.* The courts will take judicial notice, without proof, of all the laws of the state; and in doing so, will take judicial notice of what the books of published laws contain, of what the enrolled bills contain, of what

the legislative journals contain, and indeed of everything that is allowed to affect the validity or meaning of any law in any respect whatever.

3. LEGISLATURE; *Passing Bills; Procedure.* A bill was properly passed by the house; it was then properly passed by the senate, with sundry amendments; the house refused to concur; the senate then by a vote by yeas and nays, properly entered on the journal, receded from its amendments, and the bill was not passed in any other manner. *Held,* that as this manner of passing bills has always been considered sufficient in Kansas, and has always been acted upon, it will be considered that the constitutional provision, requiring that "the yeas and nays· shall be taken and entered immediately on the journal upon the final passage of every bill or joint resolution," was sufficiently complied with.

4. LEGISLATIVE BILLS—*"Subject," and "Title."* The "subject" to be contained in a bill, under section 16, article 2 of the constitution, which provides that "no bill shall contain more than one subject, which shall be clearly expressed in its title," may be as broad and comprehensive as the legislature may choose to make it. It may include innumerable minor subjects, provided all these minor subjects are capable of being so combined as to form only one grand and comprehensive subject; and, if the title to the bill containing this grand and comprehensive subject is also comprehensive enough to include all these minor subjects as one subject, the bill, and all parts thereof, will be valid.

5. COUNTIES, AND COUNTY ORGANIZATIONS, *May be Abolished.* The legislature has the power to abolish counties and county organizations whenever it becomes necessary for them to do so in changing county lines, or in creating new counties.

6. COUNTY-SEATS. Whenever a county is destroyed, the county-seat must go with it.

## *Original Proceedings in Mandamus.*

THE passage and approval of the act dividing Howard county, and creating the counties of Chautauqua and Elk — ch. 106, Laws of 1875 — gave rise to three separate actions of mandamus, each being commenced originally in this court. Said act contains, among many others, the following provisions:

"SEC. 1. All that portion of the county of Howard lying south of the township line separating township thirty-one and township thirty-two south, shall constitute the territory of a new county hereby created, to be known as the county

of Chautauqua; and all that territory lying north of said township line, is hereby created into a new county by the name of Elk.

"SEC. 2. The county-seat of said county of Chautauqua is hereby located at the village of Sedan, in township thirty-four south, of range eleven east; and the county-seat of said county of Elk is hereby located at the village of Howard City, in township thirty south, of range ten east. * *

"SEC. 3. * * * The county commissioners of said new counties shall meet together at some suitable place, on the third Monday in July 1875, and proceed to divide the afore-said property, or the value thereof, as hereinbefore provided. * * * The original records of the county of Howard shall be retained by and shall remain records of and for the county of Chautauqua."

"SEC. 10. Chautauqua and Elk counties are hereby attached to the twenty-fifth senatorial district; and until otherwise provided by law, the county of Chautauqua shall constitute the sixty-sixth representative district.

"SEC. 11. This act * * * shall take effect and be in force from and after the first day of June 1875."

Said bill, as it finally passed both houses, contained the following section, which in some manner was omitted in the enrollment, to wit:

"SEC. 3. The county officers in and for Howard county, in office at the taking effect of this act, shall be and remain such officers respectively for and during the term for which they were respectively elected. Such of them as shall then be legal electors of the county of Elk shall be officers of Elk county; and such of them as shall then be electors of the county of Chautauqua shall be officers of the county of Chautauqua. County offices in the aforesaid new counties, made vacant by the taking effect of this act, shall, within twenty days after the taking effect of this act, be filled as provided by law for filling vacancies in other organized counties."*

An act supplementary to said chapter 106 was passed and approved March 5th 1875, (Laws of 1875, page 115,) under

[* AN examination of the Senate journal shows that House Bill 54, in the Senate, was reported from the committee of the whole, February 26th, said committee "recommending its passage, subject to amendment." (Sen. Jour. pp. 481, 482.) The bill then went to its third reading, and was taken up and considered, Saturday, February 27th. It was amended by adding two new sections, to stand as §§ 12 and 13, providing that the

Statement of the Case.

which the governor appointed a county clerk and two county commissioners for the county of Elk, and one county commissioner for the county of Chautauqua. These officers, with the clerk and commissioners of Howard county, then in office, filled both boards for the two new counties; and immediately after the 1st of June, they undertook to carry into effect the provisions of said ch. 106. The three actions mentioned were thereupon instituted — first, "*The State of Kansas, on the relation of S. B. Oberlander, County Attorney of Elk County, v. Thomas Wright,*" and others, county officers of Elk county, to compel the defendants to remove their respective offices, etc., from Elk Falls (the old county-seat of Howard county) to Howard City; second, "*The State of Kansas, on the relation of J. D. McBrian, County Attorney of Chautauqua County, v. Eli Titus, Sheriff,*" and others, county officers of Chautauqua county, to compel the defendants to remove their offices, etc., from Elk Falls to Sedan; and third, "*The State of Kansas, on the relation of Isaac A. Powell and Noyes Barber, v. Miles B. Light, County Clerk of Howard*

question of dividing Howard, and creating the two new counties of Chautauqua and Elk, should be submitted to the people of said Howard county at an election to be held in April 1875, and that if upon a canvass of the votes cast at such election a majority were in favor of such division the act should thereupon go into effect. With these two amendments the bill passed. (Sen. Jour. pp. 489 to 494.) No other amendments are shown by the Senate journal. The action of the senate was messaged to the house, the message showing, that "the senate has passed House Bill No. 54," * * * "with amendments *thereon noted.*" (This message seems to have been misplaced by the clerk of the house, as it appears under date of "March 2d." House Jour. p. 787.) The bill being in the house, with the senate amendments, it was, on Monday, March 1st, made the special order for 7:30 that evening; (House Jour. 771, 772.) At the hour named, it was taken up, and *all* the "senate amendments were non-concurred in." (House Jour. 779, 780.) It would seem from the house proceedings that there were *other* amendments, but it nowhere appears what they were, if any. The bill was returned to the senate, with the action of the house, where (on the 2d of March) "the senate *receded* from its amendments" to said bill. (Sen. Jour. 544.) An inspection of the "engrossed bill"— (assuming, what is nowhere shown, that one of the amendments made by the senate, when the bill was first passed by that body, was the striking out of this "section 3,") shows that the secretary of the senate, instead of attaching a "fly" to the margin of said section, noting thereon, "Sec. 3 struck out by the senate," drew his pen around and through the section itself, actually erasing it from the "engrossed bill"—a proceeding which ought not to have been done at all until the house "concurred" in such amendment. But the house did not concur, and the senate receded, thus leaving said section in the bill. But it was in fact erased from the face of the bill, and the enrolling clerk most naturally (but erroneously) omitted it in the enrollment, and the committee most naturally (but erroneously) reported the bill "correctly enrolled."— REPORTER.]

*County,"* to compel said defendant to remove his office, etc., from Sedan back to Elk Falls—*Light* having removed said office from Elk Falls to Sedan, on the 1st of June, pursuant to the provisions of said ch. 106. In each of said cases an alternative writ of mandamus was issued, and in each the defendants appeared and answered. The cases came on to be heard together, and were so heard on the 10th of August. A. L. WILLIAMS and WILSON SHANNON, appeared for defendants *Light* and *Titus,* and for relators *Powell* and *Barber.* W. C. WEBB appeared for relators *Oberlander* and *McBrian,* and for defendant *Light.*

*A. L. Williams,* contended—1st: The question, "Shall this bill pass?" was never taken on House Bill 54, in the senate. The journal, and the agreed facts, show that the bill was first amended, then passed as so amended, and afterward that the senate *receded* from its amendments. That left the bill pending, as it came originally from the house. No further action was taken in the senate. Suppose the house should pass an appropriation bill, say $50,000, for some purpose. The senate amends by reducing the amount to $25,000, and passes the bill for such smaller sum. The house non-concurs, and the senate recedes: has the senate agreed to and passed the bill for $50,000? Clearly not. And yet that is this case, so far as the constitutional question goes. Sec. 13 of art. 2 of the constitution requires that "a majority of all the members elected to *each house,* voting in the *affirmative,* shall be necessary to pass any bill." This has not been done in this case. See 14 Ill. 297, and 1 Mich. 492.

2. The bill approved by the governor and printed as ch. 106, is not the bill actually passed, (if it passed the senate at all.) The bill passed has 12 sections. Ch. 106 has but 11 sections. Sec. 3 of the bill passed was omitted in the enrollment, and without any authority therefor. What is the legal effect of this omission? Clearly it renders the whole act, or bill, or both, void.

3. The act upon the statute book as ch. 106 legislates out

of office persons holding county offices by election for a constitutional term — and this cannot be done.

4. The bill contains more than one subject. It changes county-seats without submitting the question to a vote of the people. By the 10th section, it changes the apportionment of members of the legislature, in violation of § 2 of art. 10 of the constitution. And the act, by its very terms, "wipes out" an entire county, and then proceeds to create two new counties out of the material of the old.

*W. C. Webb*, maintaining the validity of said ch. 106, contended — 1st: The bill was legally and constitutionally passed. The proceedings thereon in the senate in all respects conformed to the requirements of the constitution. True, the senate passed the bill *with amendments,* and not otherwise. But it *passed the bill*—"House Bill No. 54." It was the *same bill,* and not another bill. The minds of the two houses met, and concurred — each had passed "House Bill No. 54." But the senate, at the passing of such bill, submitted certain other or further propositions, upon which it asked the concurrence of the house. The action of the senate, in legal effect, is the same as if it had in words said to the house, "We agree to your bill No. 54, and concur in its passage; but we ask you, not as the condition of our assent, but as a favor, to agree to these propositions, and engraft them on the bill as amendments thereto. If you so agree, the bill will the better express our wishes; but if you decline to concur, we will withdraw our propositions by receding, and let the bill stand passed, as you submitted it to us." The history of legislation everywhere is in accordance with this view, and of the action of the senate in this case. To hold otherwise, now, would be not only to establish a procedure alike cumbersome and unnecessary, but to nullify a large number of the enactments of every session. In the case of the appropriation bill suggested by counsel on the other side: The real question in that case, and in all cases, is, Shall *an appropriation* be made? The questions of right, policy, propriety and power, are all

determined by the answer to that question. The house says, *yes*, and suggests the sum of $50,000. The senate also says, *yes*, thus concurring in the passage of the bill making *an* appropriation, and for the objects and purposes indicated by the house. But it suggests that half the sum named will be adequate to the ends in view, and proposes to the house to reconsider the question of *amount*. The house considers the proposition, and non-concurs. The senate *recedes from its proposed reduction*, thus leaving the amount originally named in the bill, which it has already passed.

2. The omission of the 3d section of the bill as passed, cannot in anywise affect the validity of the provisions of the bill as approved and published, unless such remaining provisions are, by reason of the omission, incongruous, and uncertain — in which case the act might be held void *for uncertainty*, not by reason of the *omission*. But such omitted section in nowise affects or impairs any of the remaining sections. But we contend that the enrolled bill, authenticated by the officers of both houses and approved by the governor, is *conclusive*, as a record, and the court cannot go behind it to inquire as to the facts. We agreed that the facts were as claimed by the other side, but not that they were competent evidence to impeach the record, nor that this court had power to receive such evidence for that purpose.

3. As to the question of power — the power of the legislature to "wipe out" the county of Howard. It would seem that this question was settled in the case of *The State, ex rel. Hunt, v. Meadows*, 1 Kas. 90, where an act which abolished the county of Madison, was held valid, and in which the present chief justice of this court wrote the opinion. [CHIEF JUSTICE KINGMAN: "An examination of that case, as I recollect it, will show that the question of *the power* of the legislature to abolish an organized county, was not submitted to or considered by the court."] True, the precise question raised in this case was not raised or decided in that. But the case is wonderfully suggestive, and most pertinent here. While the question actually decided was, whether the act of

the territorial legislature, approved January 31st 1861, two days after the passage of the act of congress admitting the state of Kansas, was valid, yet the case has an important bearing here, as it discloses the exercise by the legislature, *under the state constitution*, of the same power exercised by the legislature in abolishing Howard county, and that the existence of that power, as a proper legislative power *was not questioned*. Madison county was created in 1855, (Laws of 1855, ch. 30, § 18.) On the north (§ 17 of same act) was Breckenridge (now Lyon), county; on the south (§ 19) was Greenwood. Each of these counties was 24 miles square. Madison was fully organized at once. By § 35, same act, and by ch. 34, page 215, same volume, the town of Columbia was made the county-seat; and ch. 41, same volume, provided for the holding of courts in Madison county. From 1855 to 1861 said county was in full operation as an organized county, with its officers, its courts, and its records. The legislature, on the 31st, of January 1861, passed an act *abolishing* said Madison county, and annexing one-half the territory thereof to Breckenridge, and the other half to Greenwood; (Territorial Laws of 1861, p. 17, ch. 13.) This court held, 1 Kas. 90, 94, that the legislature which passed that act was a valid legislature, legally in session, and, under § 3 of the schedule to the constitution, became and was invested with the lawful powers of a legislature *under the constitution*, (which had then just gone into effect by the admission of the state into the Union,) and that said act abolishing Madison county was valid. The report of that case shows that one of the able counsel on the other side of this case, (Gov. Shannon,) was of counsel there; and in his brief, speaking of the powers of the legislature which passed the act then in question, (if a legal legislature at all after January 29th 1861,) he says, (1 Kas. 94,) " *The powers* of the legislature would be those given by the organic act, limited by the *restrictions of the constitution*." When learned counsel, and learned courts, gravely trying and judicially determining an action between parties litigant, *are silent* upon a question so important there,

14—15 KAS.

(as it is so important here,) as, *whether the legislature has the constitutional power to wholly abolish an organized county, possessing and employing all the offices, officers, records and courts enjoyed by other organized counties*, that silence ought to be taken as a concession of the existence of the power. The legislative exercise of the power there, went a step further than it did in the case here. Madison county was in fact *abolished;* while Howard county is converted into two distinct counties, with its records preserved to one of them.

4. The act purports to create two *new* counties. If it does this, there can be no doubt but the legislature had power to locate the county-seat of each where it pleased. Sec. 1 of art. 9 of the constitution, so far as it relates to county-seats, applies only to those which have been first located, and it is only such that can be "changed." But if the act in question merely *divides* Howard county, setting off and creating *one* new county by the name of Elk, and changes the name of Howard to Chautauqua, (as may well be claimed from § 3 of the act as published,) then as to Elk, the power to locate the first county-seat must be conceded; and as, by the division, the old county-seat of Howard is in the detached territory, there was no county-seat in Chautauqua to "change," and it was competent for the legislature to establish one. (See *Attorney General v. Fitzpatrick*, 2 Wis. 542, 548.

5. The bill has but "one subject"—the county of Howard—which it proposes to divide and dispose of in such manner as shall conduce to the public weal. (1 Chandler, 256–258.) And as the bill has but "one subject," the "title" is most ample, clearly expressing that subject, and the general purpose of the bill in disposing of its subject.

*Wilson Shannon*, contending that said ch. 106, laws of 1875, was unconstitutional and void, submitted: Howard county was a regularly organized county, and had a county-seat established by law at Elk Falls. The county of Howard is attempted to be divided by said ch. 106. This act divides the county of Howard into two parts—calls one part the

county of Chautauqua, the other part the county of Elk. Elk Falls, the county-seat of Howard county, is contained in the division called Elk. The act fixes the county-seat for the so-called Elk county at Howard City, and is silent as to Elk Falls. The other division is called Chautauqua county, and the act fixes the county-seat of the so-called county at a place called Sedan. We claim that this law violates several provisions of the constitution, and is void, and that in a legal point of view Howard county remains as though this law had never been passed.

1. But first, we contend that this act was not passed according to the provisions of the constitution. "The yeas and nays shall be taken on the final passage of every bill."— Art. 2, § 10. "A majority of all the members elected to each house voting *in the affirmative,* shall be necessary to pass any bill."—Art. 2, § 13. "Every bill passed by the house and senate shall be signed by the presiding officers, and presented to the governor," etc.—Art. 2, § 14. "The reading of the bill by sections on its final passage shall in no case be dispensed with."—Art. 2, § 15. We claim that the act dividing Howard county was not passed in accordance with the above provisions of the constitution. The senate amended the bill as the house passed it. It was then read and passed. Afterward the senate receded from its amendments, but it was not again *read,* nor again *passed.* And this is shown by the senate journal. The senate never passed the bill which the house had passed, and the house never concurred in the bill which the senate had passed. Upon this point I specially invite the attention of the court to the case of *Spangler v. Jacoby,* 14 Ill. 298, which seems directly in point, and which sustains our view of this question.

2. We claim that the following constitutional provisions have been violated by the act known as ch. 106, Laws of 1875, to-wit:

1st. Art. 2, § 16: "No bill shall contain more than one subject, which shall be clearly expressed in its title."

2d. Art. 9, § 1: "The legislature shall provide for organiz-

ing new counties, locating county-seats, and changing county lines ; and no county-seat shall be changed without the consent of a majority of the electors of the county," etc.

3d. Art. 9, § 3 : "All county officers shall hold their offices for the term of two years, and until their successors shall be qualified."

4th. Art. 10, § 1: "In the future apportionment of the state, each organized county shall have at least one representative." And the amendment to the constitution adopted in 1873, (Laws of 1875, page xl,) provides that each organized county shall have at least one representative.

The above provision, that a bill shall contain but one subject, which shall be clearly expressed in the title, is violated by the act in question. It is not sufficient that *a* subject be expressed in the title of the act. The true and actual subject must be thus expressed. (35 N. Y. 453.) This bill, instead of containing but one *subject*, contains many. Among other things, it purports to divide Howard county into two counties. That is one subject. It changes the county-seat of Howard county from *Elk Falls* to *Howard City*. This is the practical result. This is another subject, distinct from the division of the county. And this change of the county-seat of Howard county is without the vote of the people, which is in violation of § 1 of art. 9, above quoted. But this subject of changing the county-seat is not expressed in the *title*, and no one would suspect that the bill changed the county-seat of Howard county, from reading the title. This alone makes the act void. It comes within the letter and spirit of the constitution, and is one of the very evils the framers of the constitution attempted to guard against. It cannot be claimed that the location of the county-seat at Howard City, was one of the necessary details by which the *object* of the act is to be accomplished, granting, for the sake of the argument, that the legislature could divide Howard county, and make two counties out of one. That territory which included the county-seat of Howard county had a right, under the constitution, to retain the county-seat until it was changed by the vote of the people as the constitution

provides; and the location at Howard City was not necessary to accomplish the object of the law, that is, a division of Howard county. And it is only in those cases where the act is necessary and proper to accomplish the *object* of the bill, as expressed in the title, that the courts will sustain the bill as constitutional. This question is illustrated in 47 N. Y. 504, and in 41 N. Y. 139, where the court lay down the true rule, and say, that it is only necessary that the title express the *subject* of the act, and not the provisions of the act, or the details by which the *object* of the act is to be accomplished. The object of the act, (the division of Howard county,) is in no way promoted by changing the county-seat. The county would have been divided if the county-seat had been left at Elk Falls, just as effectually as it is with the county-seat removed to Howard City. The removal of the county-seat don't affect the division one way or the other. But the main object of this act, and the division of the county, was in fact to secure for two places, Sedan and Howard City, county-seats. This was the bone of contention among the people, or rather the little cliques that had an interest in towns that they desired to give value and importance to, by making them county-seats. They therefore combine together and divide the county into two parts, and select their own villages and enact them into county-seats. Now it is this very corrupt combination, and system of log-rolling, that the framers of the constitution carefully guarded against. But dividing the territory of the county of Howard, and making two new counties out of its territory, and making county-seats in each, neither of which is or ever was the county-seat of Howard county, and requiring the records, etc., to be removed to these new county-seats, is changing the county-seat of Howard county, without a vote of the people. If this could not be done directly, it cannot be done indirectly.

3. But this law contains more than *one* subject, and in this violates the constitution. It changes the county-seat of Howard county from Elk Falls to Howard City, which object is

not expressed in the title. It creates the county of Chautauqua out of the territory of Howard county, and locates the county-seat at Sedan. This is one distinct subject, and the creation of Chautauqua county has no necessary connection with the creation of Elk county. Chautauqua county did not interfere with the county-seat of Howard county, and was the proper subject of a distinct bill. It should have been a bill entitled "A bill to create the county of Chautauqua out of part of the territory of Howard county." Such a bill would have stood on its own merits. But no such bill could have passed; hence the combination, and putting the two new counties in the same bill, and fixing new county-seats for both counties. By this combination, those interested in Sedan and Howard City were able to pass the bill, (that is, if it was legally passed;) and this is the very evil the constitution intended to prevent. The bill abolishes the county of Howard practically, and without saying so. It don't change the name of Howard, but absorbs all its territory by making two new counties, with new names, and new county-seats. This act is unconstitutional because it contains more than one subject, some of which are not expressed in the title: 1st, A division of Howard county; 2d, The creation of the county of Elk; 3d, The creation of the county of Chautauqua; 4th, The location of the county-seat for Chautauqua county; 5th, The location of county-seat of Elk county, when there was within the territory of that county a county-seat already legally located; 6th, For division of property, and indebtedness; 7th, For the taxes, and records of the same. The records are given to Chautauqua county, the new county, and not left with the old one, which retains the county-seat; 8th, The act as published impliedly provides that the officers of Howard county may become officers of whichever county they are electors in at the time the act takes effect, and makes no provision for the old officers giving bonds for the new counties; 9th, The supplemental act (Laws of 1875, p. 115,) provides for filling vacancies in office.

Can the legislature create a new county out of territory belonging to an old county, and continue the old officers who may reside in the territory of the new county, in the same offices? When a new county is created, new officers must be elected or appointed, who must give bonds as required by law. The act in question attempts to do what cannot be done under the constitution.

The act creates Elk county without representation in the legislature. This cannot be done. Chautauqua county is to be the 66th representative district. But Elk county is attached to no district. This is an apportionment of the territory of Howard county, and which was once apportioned as the 66th district, which new apportionment is made a year in advance of the time provided by law for making apportionments.

The act establishes a district court in and for Elk and Chautauqua counties, and attaches said counties to the 13th judicial district, and provides for holding courts therein.

It will thus be seen that the act in question contains more than one subject, and some of which are not expressed in the title. It is therefore unconstitutional and wholly void. Cooley Const. Lim. 148.

I will call the attention of the court to the following cases and authorities, all of which throw more or less light on the question now before the court: Cooley Const. Lim. 144, 147, 149; 14 Ind. 296; 15 Ind. 449; 16 Ind. 197; 11 Ind. 199; 9 Ind. 363, 380; 7 Ind. 681; 20 Ind. 490; 13 Mich. 492, 494; 16 Mich. 269, 277; 22 Barbour, 642; 14 Ill. 297, 299; 35 N.Y. 453; 38 N.Y. 195; 1 Wis. 204; 2 Wis. 548.

4. The bill as approved, and published, is not the bill passed, (if it was passed at all by *both* houses.) But it is objected that we cannot go behind the records of the house and senate, and inquire as to the contents of the bill which in fact was passed. This would destroy the legislature as a law-making body, and enable the *officers* of the two houses to make or alter any bill, or substitute one for another, and if the governor should affix his approval to the false or fraud-

ulent bill, it would become the law, although not assented to or voted for by a single member of the legislature. This doctrine is too dangerous to meet with the unqualified sanction of the court.

The opinion of the court was delivered by

VALENTINE, J.: The only question involved in these three cases is, whether a certain act of the legislature entitled "An act to divide the county of Howard, and to erect the territory thereof into the counties of Chautauqua and Elk, to provide for the due organization of said counties, the filling of vacancies in offices, for the proper division of the property and indebtedness of Howard county, and in regard to the taxes and records thereof," approved March 5th 1875, (Laws of 1875, p. 148,) is sufficiently valid to accomplish its object; that is, to create the two new counties of Chautauqua and Elk out of the old county of Howard; or whether said act is wholly and absolutely void. Said act was house bill No. 54. Said bill was passed by the house in a legal and proper manner. It was then taken to the senate, where it was amended in several particulars, and as amended was then passed in a legal and proper manner. It was then returned to the house, but the house refused to concur in any of the several amendments. It was then returned to the senate, and the senate, by a vote by yeas and nays properly entered on the journal, receded from all its amendments. The bill was not passed by the legislature in any other manner than as above specified. The bill was then enrolled; but by a mistake of the enrolling clerk and the enrolling committee "Sec. 3" of the original bill was left out, and the numbers of sections 4 to 12 inclusive, of the original bill, were changed, and in the enrolled bill numbered respectively from 3 to 11. The bill as enrolled was properly signed by the chief clerk of the house, the secretary of the senate, the presiding officers of the two houses, and was then presented to the governor, who approved and signed the same, and it was then filed with the secretary of state, where it is

now preserved.  The published act is an exact copy of the
enrolled bill, except that the signatures to the enrolled bill
are omitted in the published copy.  After the enrolled bill
was presented to the governor, the committee on enrolled bills
reported to the house that the bill was "correctly enrolled,"
and that they had presented the same to the governor for his
approval.  The engrossed bill, as it passed the house, is also
on file in the office of the secretary of state, but it is not
signed by any person, and there is no record evidence of any
kind whatever tending to show that it is in fact such en-
grossed bill.  The only record evidence of any kind what-
ever showing what said bill No. 54 contained, in any of its
stages from the time it was first introduced in the house until
it was finally filed as an enrolled bill in the office of the sec-
retary of state, is the enrolled bill itself.  The journals of
the two houses are entirely silent upon the matter, and the
said engrossed bill, as we shall presently see, is not a record,
nor a part of any record.  An engrossed bill, in this state, is
the bill as copied for final passage in either house.  It is the
bill, as copied before its passage, with the amendments made
up to that time, and there may be one or more engrossed
bills of each bill introduced; and each of these engrossed
bills may be different from any of the others, for each en-
grossed bill simply represents the bill as the bill is when it
is engrossed.  The enrolled bill is the bill as copied after its
final passage through both houses, and as it has passed both
houses, and as presented to the governor for his signature
and approval.  There can be only one enrolled bill.  Our
laws with regard to preserving records of the proceedings of
the legislature are as follows.  The constitution, article 2, pro-
vides :

"SEC. 10.  Each house shall keep and publish a journal of
its proceedings.  The yeas and nays shall be taken, and en-
tered immediately on the journal, upon the final passage of
every bill or joint resolution.

"SEC. 11.  Any member of either house shall have the
right to protest against any bill or resolution ; and such pro-
test shall, without delay or alteration, be entered on the jour-
nal.

"SEC. 14. Every bill and joint resolution passed by the house of representatives and senate, shall, within two days thereafter, *be signed* by the presiding officers, and presented to the governor; if he approve it, he shall sign it; but if not, he shall return it to the house of representatives, which shall enter the objections at large upon its journal, and proceed to reconsider the same. If after such reconsideration, two-thirds of the members elected shall agree to pass the bill or resolution, it shall be sent, with the objections, to the senate, by which it shall likewise be reconsidered; and if approved by two-thirds of all the members elected, it shall become a law. But in all such cases the vote shall be taken by yeas and nays, and entered upon the journal of each house."

The statutes provide — Gen. Stat. 975, section 15, subdivision sixth:

"He [the secretary of state] shall be charged with the safe-keeping of all enrolled laws and resolutions, and he shall not permit the same, or any of them, to be taken out of his office, or inspected, unless by order of the governor, or by resolution of one or both houses of the legislature, under a penalty of one hundred dollars."

"SEC. 19. It shall be the duty of the secretary of state to cause the original enrolled laws and joint resolutions passed at each session of the legislature, together with an index containing the titles of the same, to be bound in a volume in a substantial manner, and in the order in which they are approved; and no other or further record of the official acts of the legislature, so far as relates to acts and joint resolutions, shall be required of said secretary; and he shall also cause the title thereof, with the session at which the same shall have been passed, to be written or printed on the back of such volume."

The statutes require that the secretary of state shall publish the laws from these enrolled laws filed in his office. (Gen. Stat. 544, § 2.) The secretary of state is also required to publish the legislative journals. (Gen. Stat. 544, § 5.) It will be noticed, that the legislative journals and the enrolled bills are the only records required by law to be kept for the purpose of showing any of the legislative proceedings. There is no provision for preserving the engrossed bills as a record of the legislative proceedings. And as the legislative jour-

nals and the enrolled bills are, by law, records, and the only records of legislative proceedings, they must of course import absolute verity, and be conclusive proof as to whether any particular bill has passed the legislature, when it passed, how it passed, and whether it is valid or not. In many of the states, the enrolled bills alone are conclusive evidence upon this subject: *Sherman v. Story*, 30 Cal. 253; *Evans v. Browne*, 30 Ind. 514; *Pangborn v. Young*, 32 N. J. (3 Vrooms) 29; *Green v. Weller*, 32 Miss. (3 George) 650; *Swan v. Buck*, 40 Miss. 268; *Pacific Rld. Co. v. The Governor*, 23 Mo. 352; *Eld v. Gorham*, 20 Conn. 8; *Duncombe v. Prindle*, 12 Iowa, 2; *Broadnax v. Groom*, 64 N. C. 244, 247; *Fouke v. Flemming*, 13 Md. 392; *Mayor v. Harwood*, 32 Md. 471. See also in this connection, *Miller v. The State*, 3 Ohio St. 475, 479; *The People v. Supervisors, &c.*, 8 N. Y. 317; *People v. Devlin*, 33 N. Y. 269; *Supervisors v. People*, 25 Ill. 181, 183; *People v. Starne*, 35 Ill. 121. In nearly every state from which the foregoing decisions are taken, and perhaps in every one of them, they have constitutional provisions requiring that each branch of the legislature shall keep a journal of its proceedings. This is particularly true in California, Indiana, New Jersey, and Connecticut. And in every one of these states, except Connecticut, Ohio, New York, and Illinois, it is held that the final bill signed by the presiding officers of the two houses, and approved by the governor, usually called the "enrolled bill," is conclusive evidence of the proper passage of such bill, and of its validity. In Connecticut, in accordance with certain statutes in force there, the published laws on file in the office of the secretary of state, properly certified, are conclusive evidence of the passage and validity of such laws, notwithstanding that the constitution requires that legislative journals shall be kept and preserved. Since the decision made in New York, reported in 33 N. Y. 269, 279 to 282, 283, we suppose it will hardly be claimed that the state of New York furnishes any authority for going behind the enrolled bills for the purpose of impeaching the law. In Illinois it is held, that, except for certain constitutional pro-

visions in that state, "a bill signed by the speaker of the two houses and approved by the governor would be *conclusive* of its validity, and binding force as a law." (*People v. Starne*, 35 Ill. 121, 135.) The principal constitutional provision referred to is as follows:

"On the final passage of all bills, the vote shall be by ayes and nays, and shall be entered on the journal; *and no bill shall become a law* without the consent of a majority of all the members elect in each house." Const. of Ill. of 1848, Art. 3, § 21.

But the supreme court of Illinois has never held that the enrolled bills may be impeached by anything except by the legislative journals. And the legislative journals, even where they apparently contradict the enrolled bills, are not always sufficient to invalidate such enrolled bills. In the case of *Supervisors v. The People*, 25 Ill. 183, the supreme court of that state say: "The constitution does require that every bill shall be read three times in each branch of the general assembly before it shall be passed into a law, but the constitution does not say that these several readings shall be entered on the journals." And therefore, said court held in that case that an act of the legislature was valid although the senate journal did not show that the bill had been read three times.

Now let us apply the doctrine of the supreme court of Illinois to the case at the bar. And the able and venerable counsel representing the parties claiming that said Howard county division-law is void, relied, in his argument upon the question, almost wholly upon an earlier decision of the supreme court of Illinois, to-wit, *Spangler v. Jacoby*, 14 Ill. 297. We have no constitutional provision requiring that a bill introduced into either house of the legislature shall in any of its stages be spread upon the journal of either house. We have no constitutional provision requiring that any record of any such bill shall be kept or preserved, except as it is kept and preserved in what we call the "enrolled bill." The bill in this particular case (and this is true of all other bills,) was not in any of its stages entered upon the journal of

either house of the legislature. The journals in this case do not contradict the enrolled bill. They do not in any manner conflict with any presumption in favor of the validity of the enrolled bill. Nor do they furnish the slightest evidence that the bill was not legally passed by both branches of the legislature, or that it was not properly enrolled, or properly signed, by the presiding officers of the two houses, or that it was not properly approved, and signed by the governor, and properly filed away in the office of the secretary of state. Indeed, the report of the enrolling committee entered in the journal of the house does furnish some evidence that the bill was "*correctly* enrolled." We do not think that we can resort to evidence outside of the enrolled bill, and outside of the journals of the legislature, for the purpose of impeaching the enrolled bill as a valid law. Of course, we take judicial notice, without proof, of all the laws of our own state. All the courts of the state are required to do this. And in doing this, we take judicial notice of what our books of published laws contain, of what the enrolled bills contain, of what the journals of the legislature contain, and indeed of everything that is allowed to affect the validity of any law, or that is allowed to affect or modify its meaning in any respect whatever. But in doing this, if it be merely for the purpose of taking judicial notice of our laws, we cannot take judicial notice of a fact which is not allowed to affect the validity or meaning of a law in any respect whatever; and such fact cannot even be proved to us for any such purpose. For instance, if the mistake in enrolling said bill No. 54 were allowed in any manner to affect the validity or meaning of the law, as enrolled and filed in the secretary's office, we would take judicial notice of such mistake; but as such mistake (not being shown by any record) is not allowed to have any such effect upon the validity or meaning of said law, we can neither take judicial notice of the mistake, nor can it be proved to us. Now as we have before intimated, the enrolled bills, and the legislative journals, being records provided for by the constitution, importing absolute verity, we

cannot take judicial notice that they are untrue, nor can we even allow evidence to be introduced for the purpose of proving that they are not true. Therefore, as the enrolled bill of the law dividing Howard county, and the journals of the legislature, would seem to prove that said bill had been legally passed by the legislature, and had been legally approved by the governor in the form as it now appears enrolled in the secretary's office, we cannot take judicial notice that said bill was not properly so passed and so approved, and we cannot even allow evidence to be introduced showing that it was not so passed and so approved. We must therefore determine that the bill was legally passed and approved, and that it is now a valid law as it appears in the secretary's office.

There were several other objections urged against the validity of said law, but, as we think, none of them are tenable, and all of them must therefore be overruled. We think that the provision of the constitution requiring that "The yeas and nays shall be taken, and entered immediately on the journal, upon the final passage of every bill or joint resolution," (art. 2, § 10,) was sufficiently complied with. It would of course have been more formal if the senate, after receding from its own amendments, had again put the bill upon its final passage, and passed the bill without the amendments, as it had done with the amendments. But the manner in which this bill was passed has always been acted upon; and if we should now hold it insufficient we should probably invalidate a very large proportion of all the laws that have ever been enacted in Kansas. Upon this question see the case of *The People v. Chenango,* 8 N. Y. 318, 327, et seq.

The "subject" to be contained in a bill under § 16, art. 2, of the constitution, which provides that "No bill shall contain more than one subject, which shall be clearly expressed in its title," may be as broad and comprehensive as the legislature may choose to make it. It may include innumerable minor subjects, provided all these minor subjects are capable of being so combined as to form only one grand and compre-

hensive subject; and if the title to the bill, containing this grand and comprehensive subject, is also comprehensive enough to include all these minor subjects as one subject, the bill, and all parts thereof, will be valid. (*Bowman v. Cockrill*, 6 Kas. 334, 335; Sedgwick Stat. & Const. Law, (2 ed.) 517, et seq.) The title to the bill now under consideration is, as we think, sufficient for the purpose of creating, upon equitable principles as to indebtedness, property and taxation, two fully-organized new counties, to be named Elk and Chautauqua, out of the old county of Howard; and this is really but one subject, which is the substance of the bill. We would also refer to the following authorities upon this question: *Blood v. Mercelliott*, 53 Penn. St. 391; *Duncombe v. Prindle*, 12 Iowa, 1; *Brandon v. The State*, 16 Ind. 197; *Humboldt Co. v. Churchill Co. Comm'rs*, 6 Nevada, 30. Even if § 10 of the act (Laws of 1875, page 152,) should be void, the rest of the act may be valid.

We think the legislature has the power to abolish counties, and county organizations, whenever it becomes necessary for them to do so in changing county lines, or in creating new counties. Whether they could do so in any other case, it is not necessary for us now to determine. In the case of *Hunt v. Meadows*, 1 Kas. 90, it was held that an act of the territorial legislature, (Territorial Laws of 1861, page 17,) passed after the state was admitted into the union, destroying the county of Madison, was valid. In Iowa, in the case of *Duncombe v. Prindle*, 12 Iowa, 1, it was held that an act destroying the county of Humboldt, was valid. And we think such acts are valid. Of course, when a county is destroyed, the county-seat must go with it. The county-seat of an old county need not be made the county-seat of any new county, or indeed of any county, new or old, into which such county-seat may be placed by a change of county lines, or by the creation of a new county. For if such county-seat must continue to be the county-seat of the county into which it may be placed by a change of county lines, a county might some time by such change of county lines, have two or three

county-seats. In this connection see *Blood v. Mercelliott*, supra; *Atty. Gen. v. Fitzpatrick*, 2 Wis. 542.

In two of the three cases at bar—that brought by *Oberlander*, as relator, against *Wright* and others, and that brought by *McBrian*, as relator, against *Titus* and others—judgment will be rendered in favor of the plaintiff, and peremptory writs of mandamus will be issued as prayed for. In the third case, brought by *Powell and Barber*, as relators, against *Light*, judgment will be rendered in favor of the defendant, and the peremptory writ of mandamus prayed for will be refused.

All the Justices concurring.