**Richmond.**

INGLES AND OTHERS v. STRAUS AND OTHERS.

MARCH 21, 1895.

1. CONSTITUTIONAL LAW—*Title of Act—One Object.*—The title of an act of
   the General Assembly is sufficient if it gives notice of the general subject
   of the act, and of the interests likely to be affected thereby.  If the
   subjects embraced by the act, but not specified in the title, have con-
   gruity or natural connection with the subject stated in the title, or are
   cognate or germane thereto, the requirement of the Constitution (section
   15, Article V.) "that no law shall embrace more than one object which
   shall be expressed in its title," is satisfied.  Tested by this rule, the act
   of January 22, 1894, entitled "an act to authorize and provide for a
   special election in the county of Pulaski as to the removal of the court-
   house of said county," is not in conflict with Article V., section 15, of
   the Constitution of the State.
2. INJUNCTIONS—*Dissolution—Motion to Continue—Discretion.*—The dissolu-
   tion of injunctions, and applications to hear or to postpone the hearing
   of motions to dissolve them, are largely matters of judicial discretion,
   and the appellate court will not disturb the action of the court below
   when it appears that the discretion has been soundly exercised, or where
   the contrary does not appear in the record.  Courts of chancery, being
   always open to grant or to reinstate injunctions, motions to dissolve will
   not be continued except upon great necessity.  The complainant must
   be diligent to maintain his cause.
3. INJUNCTIONS—*Motions to Dissolve—Evidence.*—When a motion to dissolve
   is heard on the bill, answer, and affidavits, and the evidence does not
   show probable cause to believe that the complainant will be able to
   make out his case upon final hearing, the injunction should be dissolved.
   But if the complainant's case is supported by evidence regularly taken
   in the cause in his behalf, and on which he intends to rely on the final
   hearing, the injunction should not be dissolved on the bill and answer
   alone, but should be ordered to stand over to the hearing.

4. Injunctions—*Motion to Dissolve—Answer Under Oath Waived—Effect of Such Answer.*—Although the complainant, in a bill for an injunction, waives an answer under oath from the defendant, yet such answer, denying the equities of the bill, must, on a motion to dissolve the injunction, be treated as a denial of the complainant's case.

Appeal from a decree of the Circuit Court of Pulaski county, pronounced August 17, 1894, in a suit in chancery wherein the appellants were the complainants, and the appellees were the defendants.

*Affirmed.*

*I. H. Larew* and *J. C. Wysor*, for the appellants.

*J. E. Moore, A. A. Phlegar* and *James A. Walker*, for the appellees.

Cardwell, J., delivered the opinion of the court.

This case grew out of an Act of the General Assembly approved January 22, 1894, (Acts 1893-'94, page 41), entitled "An act to authorize and provide for a special election in the county of Pulaski as to the removal of the courthouse of said county." The act provided that

" It shall be the duty of the Judge of the Circuit Court of Pulaski county, upon the petition of not less than one hundred qualified voters, to order a special election in the said county to be held at the several voting precincts thereof, on a day to be designated by him, within thirty days after the presentation of said petition to him for the purpose of taking the sense of the qualified voters of said county whether the county-seat of said county be removed from the town of Newbern at all; and, if so removed, whether to the town of Pulaski, in said county, or to the town of Dublin, in said county."

And then, after providing for the notice to be given, the manner of conducting the election, and how the ballots should be printed and counted, the act further provides that, if three-

fifths or more of the votes cast, be cast for the removal of the courthouse to the town of Pulaski, then the courthouse and county-seat shall be removed to the town of Pulaski in said county, and the county-seat shall be thenceforward at the said town of Pulaski; or, if three-fifths or more of the votes cast be for the removal of the courthouse to the town of Dublin, in said county, then the courthouse shall be removed from the said town of Newbern to the town of Dublin, and the county-seat of said county shall be thenceforward at the said town of Dublin; but if more than two-fifths of the votes cast, be cast against the removal of the courthouse, then the county-seat shall remain at the town of Newbern; and, in the event that three-fifths or more of the votes cast, shall not be cast either for the removal of the courthouse to Pulaski, or to Dublin, but if the combined vote in favor of Pulaski and Dublin, shall be three-fifths or more of the votes cast in said election, then and in that event, the circuit judge of the county of Pulaski should immediately after the said election, and within twenty days thereafter, enter an order in the clerk's office of said county ordering another election to be held within forty days after the entering of the said order; said election to be held and canvassed, and result ascertained in like manner and after like notice, as the first election.   The act further prescribed how the ballot should be printed, &c.

On the 14th day of February, 1894, a petition was presented to the judge of the Circuit Court of Pulaski, signed by one hundred and six of the qualified voters of the county, praying that the special election be ordered in accordance with the Act of the Legislature; and the judge made the order directing a special election to be held at the several voting precincts in the county on the 6th day of April, 1894.

This election was held in conformity in all respects to the Act, and resulted in the polling of 2670 votes, of which 1439 were counted as votes in favor of removal to Pulaski, 308 as

in favor of removal to Dublin, and 923 as against removal. The result was reported by the commissioners of election to the judge of the Circuit Court of Pulaski on April 9, 1894; and it appearing by their report that two-fifths of the votes cast were not cast against the removal of the courthouse, and that three-fifths or more of the votes cast were not cast either for removal to Pulaski or to Dublin, but that the combined vote in favor of Pulaski and Dublin was three-fifths or more of the votes cast in the election, the judge, on the 18th day of April, 1894, entered an order directing another election to be held on the 22nd day of May, 1894, to determine whether the courthouse should be removed to Pulaski or to Dublin.

This election was accordingly held, and the result, ascertained by the commissioners duly appointed for the purpose, was reported to the judge of the Circuit Court on May 24, 1894. At this election 2168 votes were cast, of which 1536 were counted as in favor of the town of Pulaski, 615 for the town of Dublin, and 17 scattering votes counted as against removal; whereupon the judge of the Circuit Court entered an order declaring that the county-seat of the county of Pulaski should thereafter be the town of Pulaski, and appointed commissioners to select a site in the town of Pulaski for a courthouse, and directed all things else to be done necessary to carry out the provisions of the Act, and in accordance with the wishes and determination of the voters of Pulaski county, as ascertained by the election held.

Immediately upon the entry of this order, the plaintiffs below, and the appellants in this court, filed their bill of complaint in the Circuit Court of Pulaski county, charging fraud in the conduct of the election; that illegal votes had been cast and counted against the town of Newbern and in favor of the removal of the courthouse; that voters had been intimidated; that the Act of January 22, 1894, was unconstitutional, &c.; and praying that the petitioners for the election of April 6,

1894, and the commissioners appointed by the court to choose a location for the courthouse in the town of Pulaski, be enjoined and restrained from doing any further acts in the premises, and for general relief.

This bill was presented to the judge of the Hustings Court of Radford, who refused the injunction prayed for; whereupon it was presented to Hon. Robert A. Richardson, then one of the judges of this court, on May 30, 1894, and the injunction granted.

Answer was promptly filed, denying all material allegations of the bill, and after due notice a motion was made to dissolve the injunction on the 19th day of July, 1894; but, on motion of plaintiffs for a continuance, the hearing of the motion to dissolve was postponed to August 18, 1894, to enable them to complete their depositions. On the 18th of August they again moved for a continuance, which was refused, and the injunction was dissolved.

From this decree an appeal with supersedeas was allowed by one of the judges of this court.

Quite a number of questions have been raised in the record, but those not disposed of by the order entered in the case at the November term, 1894, of this court, which, by consent, removed the cause from Wytheville to this court at Richmond, and continued it to the January term, 1894, may be disposed of by the determination of the two main questions in the case, namely: First. Is the Act of January 22, 1894, in conflict with article 5, section 15 of the Constitution, and therefore null and void? Second. Did the judge of the Circuit Court of Pulaski county err in refusing the motion made by the plaintiffs below, August 18, 1894, for a continuance, and in dissolving the injunction at that hearing?

We come first to consider the constitutionality of the Act in question, the title of which has been quoted; and as the contention of appellants is that the Act itself is broader than

its title, containing provisions not covered by the title, and subjects not embraced in the title, we must first see what is embraced in the Act.

The first three sections of the Act contain the usual provisions for holding a special election, that special election to determine—first, whether the courthouse shall be removed; second, whether it shall be removed to Dublin or Pulaski. The fourth section simply provides that if, at the first election, more than two-fifths vote against removal, the county-seat shall remain at Newbern; but, if three-fifths be cast for removal either to Dublin or Pulaski, the place receiving three-fifths shall be the county-seat; but if two-fifths of the vote be not against removal, and neither Dublin nor Pulaski receive three-fifths, then a second election shall be held between Dublin and Pulaski, and the place receiving the highest number of votes shall henceforward be the county-seat.

After setting out that certain citizens of the town of Pulaski had proposed to donate to the county, in the event of the removal of the courthouse to the town of Pulaski, so much land as may be necessary for a site for the courthouse and jail, and to erect and construct, free of cost to the county, a safe and suitable jail; and to erect and construct, free of cost, except as to the insurance money (the courthouse at Newbern having been burned), and proceeds of the sale of the courthouse lot in the town of Newbern, a suitable courthouse, the fifth section of the act goes on to provide that before ordering the election provided for in the act, the judge of the Circuit Court shall take a good and sufficient bond, with surety, in a penalty prescribed, conditioned to cover all the undertakings of the citizens who propose to donate the location and erect the building specified, and then provides for the appointment of three commissioners to select a site in the town of Pulaski for the courthouse and jail if the vote determined that the county seat was to be moved there (similar provisions are made

in this section with regard to Dublin); and further, that, in the event of the removal of the courthouse from the town of Newbern to the town of Pulaski, the old jail at Newbern and the lot on which it is located, and on which the old courthouse stood, shall be sold as provided by law, and the proceeds therefrom, and all the, insurance money collected upon the policy carried by the board of supervisors of the county upon the old courthouse, shall be applied toward the building of a new courthouse for the county at such place as may be determined on by the election thereinbefore provided; and that it shall be the duty of the supervisors of the county to provide a suitable place in the town to which the courthouse shall have been removed by the vote of the people for a courtroom and clerk's office for the county, at which all of the courts of the county shall be held until a new courthouse shall have been built and completed.

The first clause of section 15, article 5, of the Constitution of Virginia provides that "no law shall embrace more than one object which shall be expressed in its title." A similar provision to this is found in the constitutions of most of the States of the Union, and has been construed in a large number of cases, and by many courts of last resort, both State and Federal, and the authorities that will be cited here will be of cases arising in those States having a similar constitutional provision—the words "object" and "subject" being taken to have one and the same signification.

What is the object embraced in the act of January 22, 1894, entitled, as we have seen, "an act to authorize and provide for a special election in the county of Pulaski as to the removal of the courthouse of said county"? Plainly, the removal of the courthouse of Pulaski county.

It is admitted in the argument of this case that the legislature might have passed an act simply removing the county-seat and courthouse of · Pulaski county to Pulaski city, or to

any other point in the county. Indeed, this could not be denied; but, instead of doing this, the legislature saw fit to first ascertain the wishes of the voters of the county as to the removal of the courthouse at all, and if to be removed, to what point they desired it to be removed, and at the same time made all necessary provisions to carry out the wishes of the voters of the county when ascertained.

The general rule governing in ascertaining the constitutionality of an act of this character may be stated thus: If the subjects embraced by the statute, but not specified in the title, have congruity or natural connection with the subject stated in the title, or are cognate or germane thereto, the requirement of the constitution as to the title is satisfied. 23 Amer. & Eng. Enc. of Law, p. 238-9; *Johnson* v. *Harrison*, 47 Minn. 575, 578. Judge Mitchell, in delivering the opinion of the court in the case last cited, says: "Any construction of this provision of the constitution that would interfere with the very commendable policy of incorporating the entire body of statutory law upon one general subject in a single act, instead of dividing it into a number of separate acts, would not only be contrary to its spirit, but also seriously embarrassing to honest legislation. All that is required is that the act should not include legislation so incongruous that it could not, by any fair intendment, be considered germane to one general subject. The subject may be as comprehensive as the legislature chooses to make it, provided it constitutes, in the constitutional sense, a single subject, and not several. The connection or relationship of several matters, such as will render them germane to one subject and to each other, can be of various kinds, as, for example, of means to ends, of different subdivisions of the same subject, or that all are designed for the same purpose, or that both are designated by the same term. Neither is it necessary that the connection or relationship should be logical; it is enough that the matters are connected with and

related to a single subject in popular signification.    The generality of the title of an act is no objection, provided only it is sufficient to give notice of the general subject of the proposed legislation and of the interests likely to be affected.''    See also *Powell* v. *Supervisors of Brunswick Co.*, 88 Va. 707; *Lescallett* v. *Commonwealth*, 89 Va. 878; *State* v. *Union*, 4 Broom, (N. J.) 350; *People* v. *Briggs*, 50 N. Y. 553; *Johnson* v. *Harrison*, 47 Minn. 575; *Falconer* v. *Robinson*, 46 Ala. 340, 347; *Carter & Co.* v. *Sinton*, 120 U. S. 523; *Montclair* v. *Ramsdell*, 107 U. S. 155; *Ackley School Dist.* v. *Hall*, 113 U. S. 142; *Unity* v. *Burrage*, 103 U. S. 457-59, and *Commonwealth* v. *Brown, post.*

The fact that the act authorizes many things of a diverse nature to be done will not affect the sufficiency of the title, provided the doing of such things may be fairly regarded as in furtherance of the general subject of the enactment.    23 Amer. & Eng. Enc. of Law, 239; *McGurn* v. *Board of Education*, 133 Ill. 122; *Blake* v. *People*, 109 Ill. 504; *Larned* v. *Tiernan*, 110 Ill. 173; *Mix* v. *Ill. Cent. R. Co.*, 116 Ill. 502; *People* v. *Hazlewood*, 116 Ill. 319.

An act entitled ''An act to increase boundaries'' of the county may embrace provisions for extending the borders of the county, locating the seat of justice, and accepting donations for public buildings.    *Blood* v. *Marcelliott*, 53 Pa. St. 391; *Ledger* v. *Rice*, 8 Phila. (Pa.) 167.

''An act to authorize the formation of new counties'' comprehends provisions relating to boundaries of old counties from which the new are to be formed, also provisions for the organization and sitting of courts in the new counties.    *Jasper County* v. *Spitler*, 13 Ind. 235; *Haggard* v. *Hawkins*, 14 Ind. 299; *Brandon* v. *State*, 16 Ind. 197.

Provisions regulating the manner of conducting an election to determine a change of the location of the county seat may be embraced under the title ''An act to change the location of

the county seat of ————," specifying the county. The submission of the change of location to the voters, the selection of the new site, and the removal of the county buildings, are all matters properly connected with the "change of the location," which is the subject expressed in the title of the act. *Simpson* v. *Bailey*, 3 Oregon, 515; *In re Division of Howard County*, 15 Kan. 194; *Woodruff* v. *Baldwin*, 23 Kan. 494.

The principal question in all cases like this is whether the act is in truth broader than the title; and, if so, then whether the other objects in the act are so intimately connected with the one indicated by the title that the portion of the act relating to them cannot be rejected, and leave a complete and sensible enactment which is capable of being executed. (Cooley on Con. Lim. [5th Ed.] p. 178-9); and "none of the provisions of a statute should be regarded as unconstitutional where they all relate directly, or indirectly, to the same subject expressed in the title." Cooley Con. Lim., *supra*, note 1; *Phillips* v. *Bridge Co.*, 2 Met. (Ky.) 219; *Smith* v. *Commonwealth*, 8 Bush 108.

In *Phillips* v. *Bridge Co.*, *supra*, the act of the Kentucky legislature under review was entitled: "An act to amend the charter of The Cov. & Cin. Bridge Co.," and the first section of the act increased the capital stock of the company, and the second section conferred power on the bridge Co. to sell, and on the city of Covington to subscribe to, the capital stock of the Bridge Co., and in payment thereof to sell the bonds of the city and levy a tax for the payment of the interest on the bonds; the contention being in that case that the act was in conflict with the clause in the Constitution of Kentucky which provides that "no law shall relate to more than one subject that shall be expressed in the title;" but the court held otherwise. Chief Justice Simpson, delivering the opinion, says: "The power to sell stock to the city of Covington necessarily requires that a power should be conferred on

the latter to subscribe and pay for it.  *  *  *  The subject is the same, although it relates to a transaction to which two corporations are parties, one of whom only is named in the title of the act.  If by the act a power had been conferred on the city of Covington to subscribe for the stock of any other corporation but the one named in the title of the act, then the provision would fall within the constitutional prohibition and be clearly null and void.  But as it is restricted in operation to matters pertaining to the Bridge Company, and the provisions of the act, so far as they relate to the city of Covington, are apposite to the purpose which was intended to be effected by its passage, and are sufficiently indicated in its title, it is not liable to this constitutional objection.  It was certainly not necessary for the legislature to pass two separate acts to effect the object it had in view; one to enable the company to sell the stock to the city, and another to enable the city to subscribe and pay for it.  The constitutional provision relied upon must receive a rational construction, and not one that would lead to such an unnecessary and absurd result.''

In *Ex parte Upshaw*, 45 Ala. 234, in delivering the opinion of the court, Justice Saffold says: ''It would be a violation of the letter and spirit of this constitutional safeguard if such a construction should be put upon it as would forbid the incorporation into a law of everything needful to the proper operation of the one subject to which it is limited.''  We might add many other authorities to those already cited, but we deem it unnecessary.

Assuming, however, that the act itself is broader than the title, and that such portions of the act as are not embraced in the title are to be stricken out, then, if so much of the act remains as authorized the election to be held to ascertain the sense of the voters as to the removal of the courthouse, which to our mind is clear, the result is the same, as the general law of the State would have imposed upon the board of supervisors

of Pulaski county the duty of providing a site at Pulaski city for the courthouse, jail, and clerk's office, and of erecting all needed buildings thereon, when the result of the election determined that the county seat was to be henceforward at Pulaski city, and would have given them the same control over the proceeds arising from the sale of the courthouse lot at Newbern, the remaining buildings thereon, and the insurance money, as the act in question gives them (section 925 Code of Va.); and, had they failed to perform this duty, they would have been compellable to do so by *mandamus.*

It is argued with earnestness by appellants that the title of the act we are now considering provides for but one election, while the body of the act, or the act itself, provides for two elections, and for this reason, if no other, the act should be held to be unconstitutional and void. In other words, the contention is that this second election, as it is called, could only have been provided for by a separate act. The weight of authorities, as we have seen, is decidedly against this contention. The second election was but a means to an end, and the authorities go so far as to characterize the contention under these conditions, that there should have been a separate act, as wholly untenable. Elections are held to ascertain the will of the people; in the one case as to who shall fill an office or post of trust; in the other, whether a thing proposed, affecting their interest, shall be done or not done. In the case here there might not have been any occasion for a second election, or a second vote, as it might be more properly called. The end desired was the removal of the county seat, if the voters of Pulaski county so determined, and to the place they wished it to be located. Had either Pulaski city, or Dublin, received three-fifths or more of the votes cast April 6, 1894, there would have been no second vote, or election; but, by this vote of April 6th, it was shown clearly that the will of the people was to remove the county-seat from Newbern, and it could not be

moved both to Pulaski city, and to Dublin, hence the will of
the people was again ascertained as to which of the two places
the county-seat should be moved. The vote at the second
election was overwhelmingly in favor of Pulaski city, finally
determining, in the modes prescribed in the act, that the will
of the people of Pulaski county was that the county-seat be
removed from Newbern and to Pulaski city. We can there-
fore readily see how useless it would have been for the legis-
lature to have provided by another and separate act for the
second election. In fact, we do not see that the act of Jan-
uary 22, 1894, provides for but one election; namely, an elec-
tion to ascertain the will of the people of Pulaski county as
to the location of their county-seat. We are also unable to
see the force of the contention that the act upon its face pro-
vides for a "combine" between Pulaski city and Dublin against
Newbern. On the contrary, the act appears to fairly and
justly deal with Newbern by providing that if two-fifths of
the votes cast be against the removal of the county seat, the
county seat shall remain at Newbern; and with the notice of
the election duly posted and accompanied by the order of the
judge of the Circuit Court, embodying the provisions of the
act, as to how the election was to be held, the character of
the ballots to be used, and how they were to be counted—in
fact, everything needful to inform the voters of the effect and
meaning to be given to their respective ballots—we think it
would be a reflection upon the intelligence of the voters of
Pulaski county to hold that they did not understand that a
vote cast at the election of April 6th for removal either to
Pulaski city, or to Dublin, would be counted as a vote for the
removal of the county-seat from Newbern. Nor are we able
to see the force of the contention that "the act confers on
Judge S. W. Williams another office and public trust during
his continuance in office as circuit judge, contrary to section
24, of article 6 of the constitution, and that the act invades

the province of the judiciary." The act in our opinion is a comprehensive provision, not broader than its title, for the removal of the county seat of the county of Pulaski if the people so desired, and that nothing is contained therein "so incongruous that it could not by any fair intendment, be considered germane to the one general object," but that everything contained in the act "may be fairly regarded as in furtherance of the general object of the enactment." All of its provisions should be regarded as relating directly to the same subject, having a natural connection therewith and not foreign, in any sense, to the subject expressed in the title. We are therefore of opinion that the act of January 22, 1894, is constitutional and valid; that it does not confer on judge S. W. Williams another office and public trust, or invade the province of the judiciary in any respect.

We come now to consider the only remaining question, whether the judge of the Circuit Court erred in refusing the motion of the plaintiffs for a continuance, and in dissolving the injunction, at the hearing August 18, 1894.

Section 3444 of the Code of Va. provides that the judge of the Circuit Court in which a case is pending, wherein an injunction is awarded, may in vacation dissolve such injunction, after reasonable notice. So that, where the extraordinary remedy by injunction is resorted to, the party or parties resorting to it are fully apprised by the statute that a motion to dissolve may be made at any time after reasonable notice, and the proof, therefore, to sustain the equities of the bill should be taken with all reasonable dispatch.

There were sixty-seven working days between the grant and dissolution of the injunction. Plaintiffs took depositions on only ten days, and on five of the days examined but one witness a day, and between the 19th of July and the 18th of August, but one day of the additional time given them to take their proof was utilized, and but one deposition was taken;

and the motion for a continuance on August 18, was based solely on the affidavit of one T. W. Covey, which only suggests a desire to take depositions of about "two hundred more" witnesses, but does not state that any of them were known or believed to be material.

The motion to dissolve on August 18, was heard on the bill, the answer of the defendants denying specifically and generally, without the least evasion, all of the equities of the bill, and every material allegation therein contained, and on the depositions of twenty-eight witnesses examined for the plaintiffs.

It is true that upon a motion to dissolve an injunction the defendant is considered the actor, and upon him rests the burden of disproving the equities of the bill. Such full and positive proof, however, is not exacted as would be necessary upon a final hearing of the cause, since the effect of requiring such strictness of proof might be to prevent a dissolution until the final hearing. And for the purposes of such motion, defendant's answer is to be taken as true, so far as responsive to the allegations of the bill, and so far. as it fully and fairly meets complainants equities without evasion, and without passing over material allegations. High. on Inj., sec. 1470; *Miller* v. *Washburn*, 3 Ired. Eq. 161; *Worth's ex'ors* v. *Perrow*, 4 Rand. 1. But it may be suggested that this rule applies only to an answer under oath. "If plaintiff waives the answer of defendant under oath, while such waiver deprives the answer of its effect as evidence, and dispenses with the necessity which would otherwise exist of disproving it by testimony equivalent to that of two witnesses, yet such answer, if it negatives the equities of the bill, must be treated, upon a motion to dissolve, as a denial of plaintiff's case." High on Inj., § 1527; *Lockhart* v. *City of Troy*, 48 Ala. 579.

The dissolution of an injunction is largely a matter of judicial discretion, to be determined by the nature of the particu-

lar case under consideration, and so as to a motion to continue
a motion to dissolve; and where this discretion has apparently
been soundly exercised by the judge below, and especially
where the contrary does not appear in the record, this court
will not disturb the action of the lower court. *Clinch River
Mineral Co.* v. *Harrison*, decided at the January term of this
court, *ante*, p. 122.

"When a motion is made to dissolve an injunction, the court
of chancery never continues it unless from some great necessity,
because the court is always open to grant, and of course to re-
instate an injunction wherever it shall appear proper to do so."
1 Barton's Chan. Pr. (new) 467. Applying this established
rule to the case at bar, we do not think that the judge of the
Circuit Court erred in overruling the motion for a continuance
August 18, 1894. He doubtless did, and rightly, take into
consideration, not only the general features of the case, but
the injury and inconvenience resulting from a protracted liti-
gation over the location of the county seat.

Nor do we think that the judge of the Circuit Court erred
in dissolving the injunction at the hearing on August 18, 1894.
"Where a motion to dissolve is heard upon the bill, answer,
and depositions used as affidavits, and the evidence does not
show probable cause from which it may reasonably be inferred
that plaintiff will be able to make out his case upon final hear-
ing, the injunction will be dissolved. If, however, plaintiff's
right to relief is supported by evidence regularly taken in the
cause in his behalf, and on which he intends to rely upon the
final hearing, the injunction will not be dissolved upon bill
and answer alone, but, will be ordered to stand over to the
hearing." High on Inj., sec. 1526; *Cunningham* v. *Tucker*, 14
Fla. 257. Following this rule strictly when applied to the
case at bar, the judge of the Circuit Court was clearly right
in dissolving the injunction, as the depositions read on behalf
of the plaintiff at the hearing, did not show probable cause

Opinion.

from which it might have been reasonably inferred that plaintiffs would be able to make out their case upon final hearing, nor did this evidence support plaintiffs' right to the relief set up in the bill. On the contrary, we think that the weight of this evidence is against the allegations of the bill. At all events, it fails to support them, and plaintiffs' counsel admit that with twenty-eight witnesses examined, the charge of fraud, which is the gravamen of the bill, was not made out. Therefore, if the motion to dissolve the injunction rested only on the bill and the answer denying all the grounds of equity set up in the bill, the injunction should have been dissolved. *Hogan* v. *Duke*, 20 Gratt. 244; *Moore* v. *Steelman*, 80 Va. 331; *Motley* v. *Frank*, 87 Va. 432.

We are therefore of opinion, upon a review of the whole case, that the decree complained of, entered by the judge of the Circuit Court of Pulaski county August 18, 1894, is clearly right and must be affirmed.

BUCHANAN, J., concurs in the results.

AFFIRMED.