Owen, C. J.,
dissenting from the judgment, and especially from the action of the majority of the court in sustaining the motion to strike out the fifth paragraph of the reply, filed the following dissenting opinion :
The plaintiffs allege, in the fifth paragraph of their reply :
The act under which the members of the board of public affairs claim their offices is null and void; that the pretended passage, signing and filing the same with the secretary of state, is part of a conspiracy entered into between the president of the senate and seventeen members thereof; that such conspiracy was carried out by the parties to it in the following manner. (The names of the thirty-seven senators who were duly elected to the senate are here given.) It is alleged that on the 8th day of May, 1886, while nine *375 teen members of the senate (naming them) were absent from the senate chamber, and while only seventeen senators, being less than a quorum of the duly elected senators, were present, the president of the senate, with the advice and consent of these seventeen senators, and in the absence of the majority of the senators, knowingly, unlawfully, fraudulently, and in violation of the constitution of the state and the rules of the senate, caused the clerk of the senate to enter upon what purported to be the journal of the senate, but which was not such in fact, the pretended adoption of a resolution, declaring that four of the senators — Brashears, .Hopple, Keuhnert, and Wilson — were not duly elected as members of the seuate, and not entitled to seats therein, and that Iiardacre, Richardson, Kirchner, and McGill had been duly elected members of such senate, and were entitled to seats therein. That only seventeen senators were present and voted for such resolution, and the vote was not taken by yeas and nays, as required by the rules of the senate, and a majority of the senators did not vote, who were temporarily absent from the state, with the intention of returning, and with no intention of vacating their seats or surrendering their rights as senators; that the president of the senate and said seventeen senators (naming them) fraudulently and corruptly conspired and caused what purported to be the journal of the senate to be so falsely and fraudulently made and kept as to show that such pretended resolution had been adopted; that after this said Hardacre, Kirchner, McGill, and Richardson, without being sworn, claimed to have been admitted toseats as members of the senate; that in furtherance of such conspiracy, and during the continued absence from the senate of the nineteen senators, before named, the pretended act, of May 17, 1886, under which the pretended board of public affairs claims to have been created, was declared passed and signed by the president of the senate, and only seventeen senators were present or voted at the time of the alleged passage of such act and the signing of the same by the president of the senate, yet said pres *376 ident of the senate and seventeen senators corruptly and fraudulently caused the pretended journal to be so falsely and fradulently made, kept, and signed as to show that the pretended act had been passed by the senate and signed by the president in its presence; that the president of the senate, speaker of the house of representatives, and secretary of. state, at the time of the signing and filing of such pretended act, well knew that the samehad not been passed, and was fraudulent and void ; that at no time from May 5, 1886, until the alleged adjournment of the senate, was there ever a quorum of members present for the transaction of business; and that neither a quorum nor a majority of the members elected to said body ever assented or agreed to such resolution, or concurred in the passage of the pretended act, above mentioned.
There can be no serious discussion of the legal effect of a motion to strike out.
It is an admission, for the purposes of considering the questions involved, of the truth of the facts alleged.
The averments of this paragraph are equivalent to an offer to prove the facts so alleged. The legal effect of a motion to strike out matter from a pleading for irrelevancy was considered in The State v. Harper, 6 Ohio St. 610. Bowen, J., speaking for the court, said: “The 118th section of the code authorizes irrelevant matter, inserted in any pleading, to be strikeu out on motion of the party prejudiced thereby. . . . The motion, in such case, took the place and served the office of a demurrer.”
What is the office of a demurrer? “A general demurrer admits the truth of facts as stated in the pleading.” McIlvaine, C. J., in Mitchell v. Treasurer of Franklin Co., 25 Ohio St. 153. While it is true that facts not well pleaded, and mere conclusions of law, are not admitted by a demurrer, there is no pretense that the averments in this paragraph of the reply are mere conclusions of law, or that the facts are not well stated. The claim is that the facts stated, if established, would be immaterial, irrelevant, and constitute no valid ground of objection to the act in ques *377 tion. To contend that these averments are not admitted by the motion because they are irrelevant and immaterial is to assume the very point in controversy. It follows that for the purposes of the questions raised by the motion it is admitted that the president of the senate and seventeen members entered into a conspiracy to subvert and evade a plain provision of the constitution of the state ordaining that: “A majority of all the members elected to each house shall be a quorum to do business; but a less number may adjourn from day to day, and compel the attendance of absent members,” etc. Art. 2, sec. 6; and that this conspiracy comprehended a scheme to cause what purported to be, but was not, the journal of the senate, falsely to show such business to have been done as could not constitutionally be transacted under that provision of the constitution, which was sought to be subverted. That is, by these avermeuts if is offered to prove, and by this motion it is admitted that a number of members less than a quorum, and who were wholly unauthorized to do more than adjourn from day to day and compel the attendance of absent members, fraudulently conspired to proceed with such unauthorized business, to vote out four members and vote in four other persons to take their places, and to cause a false and spurious journal to be so fabricated as to conceal the absence of a quorum, and thus to accomplish by a deliberate conspiracy against the constitution what its plain provisions expressly prohibited.
And this court is appealed to to ratify and sanctify this assault upon the constitution and upon representative government by declaring that the averments by which it is brought to our notice are irrelevant, immaterial, and scurrilous. How the' proof was to be made does not apppar. How far this pretended journal ■would establish it is not disclosed. It is idle to say that this court will take judicial notice of a senate journal; for no document purporting to be such journal has been before the court in any form, nor have we been made acquainted with its contents beyond what is disclosed in this reply; and intuitive knowledge of *378 its contents will not be ascribed to the court or any member of it. It follows that the question of “going behind” the senate journal, which has so prominently engaged the discussion of this case, is not before us. By the averments of this reply there was no senate — simply a number of its members wholly without power to act. There was no senate journal, but a false nnd fraudulent pretense of one; and for aught that appears in this case, this pretended journal might, if offered in evidence or brought before us, be relied upon to establish, in part, the facts averred. It thus appears that the claim that these facts are immaterial because they would contradict a legislative journal is absurd; and the following language of Thurman, J., in Miller v. The State, 3 Ohio St. 484, which is cited by the defendants, has no application to the question before us. He said: “It seems to us, that where the journals show that a bill was passed, and there is nothing in them to show that it was not read as the constitution requires, the presumption is that it was so read, and this presumption is not liable to be rebutted by proof.” He was here discussing the mode of passing an act prescribed by the constitution, as distinguished from the authority to pass it.
But this eminent jurist used, in the same case,the following language, which, in the light of the present case, seems prophetic : “ By the term ‘ mode’ I do not mean to include the authority in which the law-making power resides, or the number of votes a bill must receive to become a law. That the power to make laws is vested in the assembly alone, and that no act has any force that was not passed by the number of votes required by the constitution, ajre nearly or quite self-evident propositions. These essentials relate to the .authority by which, rather than to the mode in which, laws are to be made.” See Fordyce v. Godman, 20 Ohio St. 17, where this view is approved by Scott, J.
In the case at bar it stands admitted that there was no authority to do any business as a senate. The averment is that but seventeen senators voted for'the act.
The attempt to sustain the act in question by the rule *379 relating to officers defacto is a palpable misapplication of a familiar doctrine. Among other cases relied upon is that of Ex parte Strang, 21 Ohio St. 610. It was there held that where au act of the general assembly in form authorized the mayor of a city to appoint a police judge, such appointee was a judge de facto, and that his acts were binding when questioned collaterally, although the act authorizing such appointment was not warranted by the constitution. It is declared in that case that “it is sufficient if he derives his appointment from one having colorable authority to appoint; and an act of the general assembly, though not warranted by the constitution, will give such authority.” Here was the form of a law passed by the general assembly fully authorizad to act, and in strict pursuance of its terms the appointment was made and the appointee proceeded to act. Here was certainly color of authority to appoint. But in the case before us there was not the slightest color of authority to constitute the persons members of the senate who are relied upon to give vitality to the act. Their title to their seats has never risen higher than a deliberate plot to circumvent a plain command of the constitution. But it must be remembered that the averment of the reply is that less than a quorum (seventeen members) were present when this act was passed.
There is another principle which is fatal to the view here contended for and adopted by the majority. There is no form of direct attack upon the authority of these pretended senators to act, recognized by the law. The present is the only available form of attack upon their proceedings.
Quo warranto would not lie to call in question their authority to exercise the functions of senators. The present is to be treated as a direct attack, for the reason that no other form of attack can be made. The principle is well established that where a .direct attack upon a proceeding can not for any reason be made, it may be collaterally questioned. Vose v. Morton, 4 Cush. (Mass.) 31, and cases there cited.
In the case of the police judge there is no question but *380 quo warranto proceedings would lie to oust him from his office, and for this reason, until this is done, his acts are binding as against collateral attack.
In Opinion of the Justices, 56 N. H. 570, the supreme court of New Hampshire was called upon for an opinion concerning the right of Priest and Proctor to retain seats in the senate. It was held that where the senate, in pursuance of its power to “judge of the elections, returns, and qualifications of its own members,” have adjudged that a person claiming a seat as senator was duly elected and possessed of the requisite qualifications, their judgment is final, and can not be questioned by the executive or judicial departments of the government. But the opinion concludes with this very significant statement: “ The foregoing opinion is based entirely upon the facts stated in the preamble to the resolution, and upon the assumption that when the senate undertook to act as final judges of the qualifications and elections of Messrs. Priest and Proctor there was a constitutional quorum present.”
It is noticeable that no case is cited by counsel, or by the majority, sustaining the view that acting members of a legislative body seated without authority are to be regarded as defacto members.
The authorities upon this question are well summqd up in McCrary on Elections (sec. 517), where the able author says : “ The cases in which the official acts or votes of members of a legislative body who are such defacto only, and not de jure, have been held valid, are all cases in which there was no question as to the legality of the body in which they sat. They are cases in which the body admitting such persons was, in doing so, acting within its admitted jurisdiction, and in such cases the courts will not inquire into the title of such members to their seats. The courts, in such cases, will go no further than to inquire as to the legal status and authority of the body as a whole,” etc. The italics are the author’s.
This effectually and conclusively disposes of all that has been said for the misconceived theory that an executed con *381 spiracy between the presiding officer and a number of members less than a quorum of a legislative body to remove some of its members and induct other persons as members constitutes the latter de facto members of such body. It will be observed that the proceedings of the persons who assumed to be a senate are not attempted to be justified by the absence from the senate and state of a majority of the senators.
If seventeen members could transact such business so could seven, or any less number. Indeed, let it once be established that a plain provision of the constitution can be subverted or wholly disregarded by such means as it is here admitted were employed, and it is vain to speculate upon what may not be accomplished in an effort to contravene the oi’ganic law of our state.
In this case the court is-called upon to consider a radically new question. It is creditable to the legislative departments of the states that no court of last resort of any one of them has ever before been required to deal with such a question. The industrious research of counsel has failed to produce a ease, and it will be observed that not one is cited by the majority of the court, which tends in the slightest degree to support the extraordinary proposition which is here contended for. To apply the cases cited and relied upon it is necessary to assume an entirely different state of facts from those which appear in this case. Cases are found supporting the principle that courts will not inquire into the motives which prompted the enactment of a law. Their soundness will not be questioned. They all presuppose full anthority to act. Here there was entire absence of authority.
If the position reached by the-majority be tenable, these startling conclusions follow: When both.branches of the general assembly, possessing undoubted authority to act, and acting in good faith, overstep in the slightest degree the limitations of the constitution in the attempt to enact a law, this court is clothed with abundant authority to overturn it and declare it a nullity; but where less than a quorum of a single branch, utterly without authority to act, by *382 a scheme of conspiracy and fraud, unparalled in the history of legislation, overthrow and disregard a plain command of the constitution, and cause a false, spurious, and pretended journal to make that appear which was not and could not be done, this court — the court of last resort in the state— which has ever been regarded as the last refuge of a broken constitution, is compelled to confess itself helpless and powerless to do more or less than ratify or sanctify the great public wrong by pronouncing upon it its solemn approval.
The fallacy of attempting to apply to this case the sentiment — sometimes mistaken for a principle — that the judicial department of the state owes entire immunity to its coordinate branches is obvious. There is no pretense that there was a senate authorized to act. One of the eminent judges constituting the majority, speaking for himself in a dissenting opinion in The State ex rel. Dalton v. Richardson, 43 Ohio St. 682, said: “It is a fundamental principle that every citizen and every public officer, however high his grade, is amenable to judicial control. It was but a few years since that the governor of this great state was arrested by the sheriff of an adjoining county and compelled to stand at the bar of the court, and plead as a common criminal. He did not claim nor could he claim exemption from obedience to the mandates of the court.”
This was a co-ordinate branch of the state government, not a mere usurper of its functions. No question of conspiracy to subvert the constitution was involved. So far as we are advised no question of irrelevancy, immateriality, or scurrility availed to prevent inquiry into the manner of exercising the executive functions of the state.
The eases which are relied upon to establish the sacredness of legislative journals from collateral inquiry or contradiction, all proceed upon the assumption that (1) there was authority to act and make a journal, and (2) there was a legal journal.
Here there was neither.
The contention that this conspiracy was so comprehen *383 sive in its workings — was carried to such extravagant limits and assumed such formidable proportions — that (though it be conceded that every step taken in its progress was over a broken constitution) it would create discord or disaster to call it in question now, is a novel argument.
"Without questioning in the slightest degree the sincerity of conviction which has prompted the conclusion reached by the majority, it would be vain for the writer of this dissenting opinion to attempt an expression of his measureless regret that the disposition of this case has been allowed to rest upon the admission which, in legal effect, is involved in this motion to strike out. Whether the plaintiffs would have been able to prove the facts alleged in this reply it is idle to speculate. For the purposes of this case they stand as proved and established facts. But it was due to the people of the state; it was due to the presiding officer and these seventeen members of the senate, who are strangers to this proceeding and who have had no opportunity to be heard in a matter which so gravely involves their official conduct; it was due to them as eminent citizens and officials of the state, that this motion to strike out be overruled, and that the plaintiffs be called upon to prove the truth of these startling charges. If upon a hearing they bad proved unfounded, all good citizens would rejoice. If they had proved true in fact, it is due the state and this court that the great crime against the constitution and against representative government be rebuked and redressed. But as it is, this unfortunate admission, and the announcement that there is no remedy in this court for the acts admitted, are left in this record — an abiding menace to our institutions — to breed popular distrust of the stability of our constitution, and of the power of this court to shield it from schemes and conspiracies to undermine and subvert it.
Spear, J.
Although entirely satisfied with the majority opinion, in so far as it discusses the questions therein presented, in view of the importance of the case, and especially of its treatment by the chief justice in the dissenting opinion, I have deemed it proper to present a statement *384 of the ease as understood by me, with some views upon the questions involved, believing that such statement may contribute to a proper apprehension of the merits of the case itself, and of the action of the majority in the judgment rendered.
It is important, in preparing a statement of reasons for a particular view of a case tried and submitted to a court for decision, to keep in mind, with some care, the case actually submitted for the court’s action. To do this to any purpose the proceedings at the trial ar’e essential; and these will be particularly referred to further on.
The question which elicited the most controversy in the case at bar was as to the motion of the defendants to strike out the fifth paragraph of the reply of the relators. It has been assumed that by filing this motion the defendants have admitted the truth of all the allegations of the reply sought to be stricken out; this because a demurrer is said to admit the truth of the allegations of the pleading demurred to. I can not agree with this assumption. A motion is defined to be an application for an order. It performs an essentially different office from that of a demurrer. A demurrer raises an issue of law. The decision of a demurrer is a judgment. However the fact may be now, under the common-law practice, it contemplated a termination o.f the case. The demurrer was held to admit the matters of fact that were sufficiently pleaded because the party, having had his option whether to plead or demur, was taken, in adopting the latter alternative, to admit that he had no ground of denial or traverse. We need not stop to consider whether, under the present code practice, where the right to amend and to plead after decision of a demurrer is distinctly provided by statute and universally recognized, the iron rule of the common law ought to prevail or not, it is enough to say that such a result never was considered, under the common-law practice, as ensuing upon the determination of a motion. The decision of a motion is an order. It excludes the idea of a judgment. It is the written direction of a court, other than a judgment, and not *385 included in it. See Darrow v. Miller, 3 Code Rep. 241. A motion is largely addressed to the discretion of the court, and refusal to strike out is rarely ground of error. Yery different as to a demurrer.
This motion is for an order to strike out the language of that paragraph as redundant, irrelevant, and scurrilous. The objection thus made is that a part is superfluous, and that the remainder is irrelevant because it can not be the subject of a material issue, has no bearing on the controversy, and can not affect the decision of the court. In other words, it is impertinent. In addition, it is scurrilous, in that it charges wrong doing upon the members of an independent branch' of the government concerning a matter about which they can not in this case in any manner be made amenable to the process, control, order, or judgment of this court, and is therefore a charge not fit to be here made.
But, even if the motion had been treated as a demurrer, still no admission would have followed. In legal contemplation the journal of the' senate (as to the contents of which and their legal effect we will see further on) would be before the court at every stage of the ease, as completely before the court and a factor in determining all questions which might arise, as it could be had its contents been copied in full in the answer of defendants.
Further considering differences between demurrer and motion, this distinction may be observed: If the testimony in support of the allegation would be admissible, but yet, though proven, the facts would be insufficient, and amendment might cure, then demurrer is proper to raise the question; but if no testimony at all can be received in support of the allegations, and amendment would not help the pleading, then motion is proper. Now, in this case, the journal being before the court, no proof at all could be received to contradict, or add to, or vary it, and, as motives of legislators can not, in a proceeding of this kind, be assailed, motion was the proper mode of disposing of the irrelevant matter. An inquiry as to the truth of the charges *386 would be useless, for, where no proof can, in any event, be received, it can not become important to consider at all the truth or falsity of the allegations.
That the case of State v. Hooper, 6 Ohio St. 608, does not in any way aid the claim that the allegations of the fifth, paragraph are admitted by the filing of the motion, will, I think, be apparent upon a careful examination of it. In that case, suit had been brought upon the bond of a county treasurer to recover a balance due from him upon settlement, which he refused to pay over. To the petition he answered that his residence had been forcibly broken open and the money stolen. The plaintiff moved to strike the whole answer from the files. The entire opinion upon this subject, of Bowen, J., is as follows: “The 118th section of the code authorizes irrelevant matter inserted in any pleading, to be stricken out on motion of the party prejudiced thereby. This made it competent for the coux’t to strike out the defendant’s answer, if the matters which it contained were irrelevant, and fonmed no gx'ound of defense to the action. The motion, in such case, took the place and served the office of a demurrer. By the act of February 20, 1856, amendatory of the 101st section of the code, the plaintiff may demur to the answer for insufficiency, and this law necessarily supersedes the practice of moving to strike the answer from the files. The answer and motion in this case were filed befox’e the adoption of the last named act, and are, therefore, not affected by it.” By this language it appears that while prior to the amendment spoken of, motion was the px’oper paper fox' the plaintiff to interpose, after that amendment a demurrer only, in such case, would be warranted. It will be noticed, too, that this was a motion to an entire answer; not a motion to a reply, and to a pox’tion of that only. It took the place of a demurrer in every essential particular. Upon its determination there was nothing in the way of a judgment for the plaintiff'. Not so in this case. The motion went to a part only of the pleading, and upon its determination the demurrer to the other pox’tion of the reply remained to be disposed of. It is impossible to see in this *387 case of State v. Hooper the slightest intimation, in language or by inference, that, under our present statute, a motion admits the truth of what the court is asked to order stricken out.
But “the averments of the paragraph are equivalent to an offer to prove the facts so alleged.” Yery well; then the motion is equivalent to an objection to the testimony. Such objection raises the question of relevancy, as well as other questions. In such case is the- objector to be told that the making of the objection is an admission of the truth of the proffered testimony? If- it be so, the unsuccessful objector is in a sad plight indeed. Having sought to obtain the judgment of the court upon his objection, which turning against him, his client is concluded as to the fact. I have not supposed this to be the law.
Again: By our statute, sections 5081 and 5129, Revised Statutes, allegations of new matter in a reply are to be deemed controverted by the adverse party as upon a direct denial or avoidance. In the face of the provisions of these sections the defendants are advised that, “ for the purpose of this case, they (the allegations of the fifth paragraph) stand as proved and established facts.” The statute itself having put the defendants in the attitude of directly denying those allegations, yet, desiring to anticipate, by a perfectly regular and usual mode, the offer of the testimony and the action of the court as upon objection to it, the parties are informed that, for every purpose of the case — impliedly in view of all moral, as well as legal, aspects of the controversy — those allegations “ stand as proved and established facts.” I most respectfully dissent from the position, and from the conclusion which this false assumption leads to.
In view of what actually occurred at the hearing, this assumption of admission works an injustice to the counsel for defendants; and, when the facts referred to are reviewed, it will appear that there is no ground in fact for this impression, nor for the equally erroneous one that the court is not in possession of the contents of the senate journal. The counsel were very careful to leave no room for such impres *388 sions. The argument of the case was opened by the attorney-general in support of the motion. He gave to the court, from a memorandum in his possession at the time, a resume of the proceedings of the senate for some time prior to the 17th of May, the day when the act in question, abolishing the board of public works and establishing the board of public affairs, was passed. By this statement it appeared that, in the contest between George W. Hardaere and three others, as contestants, and John Brash ears and three others, as contestees, for the seats of senators from the county of Hamilton (which had been pending from a date anterior to the organization of the senate), a committee was appointed early in the session to take testimony and report. A large volume of testimony was taken by each side. One branch of the committee reported in favor of the contestants, another branch in favor of the contestees. These reports were presented on the 29th day of April. On that day, by resolution, the 5th day of May following, at 11 o’clock a. m., was fixed as the time for the consideration of the reports. The journal of that day showed that, upon a call of the senate, there was not a quorum present. The same fact appeared on the 6th and 7th days of May. On one of these days the president of the senate ordered to be issued to the sergeant-at-arms process for the arrest of the absent senators. The journal of the 8th day of May was silent as to the number of senators present. It shows that the report favoring the claims of the contestants was adopted, and that the senators thus found to have been duly elected and to be entitled to their seats were sworn and admitted. The journal of the 14th and of the 17th of May shows that the act in question was passed by the requisite number of votes, upon a call of the yeas and nays, as required by the constitution, and the due signing of the bill. To all this statement of the attorney-general as to the proceedings of the senate, as shown by the journal, there was no contradiction by opposite counsel. One of the gentlemen who argued for the relators — not one of the counsel of record— mistaking the language of the attorney-general as to the *389 proceedings of May 8th — understanding him to use the word “ conceded,” whereas the word used was “ contended” — assumed that he had stated that, as matter of public history, there was not a quorum of the senate present. This was a misapprehension. The attorney-general did not say that or any thing equivalent to it. On the contrary, the logic of what he did say imported the very opposite.
Later in the argument, another of the counsel for the defendants, having in his hand a certified copy of the journal, stated what appeared upon it on the dates in question substantially as before stated by the attorney-general, and no contradiction was made of the facts as he stated them. And thus the statement of facts regarding the senate journal stood until the- closing argument, when the counsel who closed the case for the defendants reviewed the facts, as shown by the journal, substantially as had been done by his colleagues, and based his argument upon the journal, as thus shown. Still there was no contradiction as regards the contents of the journal. He also corrected the misapprehension of opposite counsel as to the claimed admission of the attorney-general, and that correction was not disputed. Nor was it claimed at any time by relators’ counsel, at the hearing, that the journal termed “a pretended journal” was a counterfeit of some other journal in the sense that there was somewhere a real, genuine journal, which, if produced, would disclose a state of facts different from those claimed by defendants, and of which the journal quoted from by defendants’ counsel was a spurious substitute, but simply that the book kept as a journal was a pretended one, because, as they claimed, the body itself was incapable of legally taking such action as the journal shows was taken, and because the journal did not truly show all it ought to have shown upon the date it purported to make a record of. It was at no time denied, neither could it be, that the body then in session, at least for some purposes, was a legal body. That it was legally in possession of the senate chamber; that the duly elected officers of the senate were present in the discharge of their *390 duties, having all the books, papers, records, journals, etc., of that body rightfully in their possession and control, with unquestioned right to keep a journal — all of these facts were beyond dispute, and I have no recollection that any dispute of either of them was attempted.
The authority cited (Wharton) in the majority opinion supports the holding that the journal of the senate, being a public record of the proceedings of a branch of the legislative department of the government, did not need to be formally offered in evidence. It was one of which the court would take judicial notice, and the mode adopted of bringing its contents to the attention of the court was the usual mode, and so passed unchallenged. Further authorities in support of this position may be cited :
“ Courts are bound, judicially, to take notice of what the law is, and to enable them to determine whether all the constitutional requisites to the validity of a statute have been complied with, it is their right, as well as duty, to take notice of the journals of the legislature.” People v. Mahany, 13 Mich. 481.
“ The journals of the two houses of the general assembly are public records, of which the courts will take judicial notice, and if it appear from said journals that an act was not passed according to the forms of the constitution, it will be declared not to have the force of law.” Moody v. State, 48 Ala. 115.
“The courts will take judicial notice, without proof, of all the laws of the state; and in doing so, will take judicial notice of what the books of published laws contain, of' what the enrolled bills contain, of what the legislative journals contain, and, indeed, of every thing that is allowed to affect the validity or meaning of any law in any respect whatever.” Division of Howard County, 15 Kan. 194.
But, whether the senate journal should be taken judicial notice of in the same sense that public laws are so noticed, or whether (as is not doubted by any of the authors who treat of the subject) it should be treated as a public record ; *391 recognized as such by the court upon being produced without collateral evidence of its identity or genuineness, it is obvious that the result must have been the same in this case. The court was duly apprised of the contents of this journal, and having such knowledge it would he bound to take notice and give to the journal its legitimate and legal effect. An inquiry was addressed by a member of the court to counsel, asking what would he desired on the part of counsel in ease the motion and demurrer should be sustained, and what in case they should be overruled? To the first, counsel for relators responded that they would offer nothing further, and that would end the case. To the second, that he presumed there would be no controversy as to the facts, and that counsel could probably agree on a statement of facts. To this counsel for defendants responded that they denied the allegations of fact as set up in the fifth paragraph, and that they would go to trial in the event of the demurrer and motion being overruled. Then, addressing opposite counsel, he remarked: “You do not claim that you could prove the allegations of the reply?” to which the counsel responded, in substance, “ that he certainly did so claim.” There had been present at the hearing several prominent members of the senate, known to have been subpoenaed by the relators as witnesses, and it is not unfair to presume that they had been so brought for the purpose of being called in case the motion to the reply should be overruled, and the case tried upon testimony. After the ease was submitted, and the court had adjourned until a day in the following week, and the judges had retired to their consultation room, one of the counsel representing each side appeared in the consultation room, and the counsel for defendants then stated that he had a copy of the senate journal which he would leave if desired. Opposite counsel objected, and added, in substance, that if evidence were gone into they would show that the original journal of May 8th was lost. No consultation was had among the j udges as to the suggestion, but one of the judges responded, in substance, that *392 it was hardly necessary, and the counsel retired. I do not regard this interview as. at all important, but give it as a part of what was said about the journal. Even if the original journal of May 8th were “ lost,” it probably will not be doubted that the senate had abundant power to supply it, or that the supplied journal would have all the efficacy of the original. Nor was it suggested that the certified copy used by counsel at the hearing was not taken from the original. It probably makes no difference.
In the light of the real case thus presented to the court, it can, it seems to me, hardly be claimed that in any sense was there an admission of the allegations of the replj as to conspiracy and unconstitutional proceedings ; nor, upon due reflection, can it be concluded that the court was not made acquainted with the contents of the senate journal.
The denial of counsel referred to, in view of the unquestioned statements of counsel, implied a great deal. It implied that if the presence or absence of the requisite number of senators at a time antecedent to the passage of the law in question could be made the subject of parol inquiry at all, it would follow logically that the validity of official titles would be embraced and tried in the inquiry; that the opening of the door for testimony would lead directly to the question of who in fact were the duly elected senators from Hamilton county. The relators insist that it is the duty of the court to open up a question of evidence which inevitably points to an investigation of matters which a short time ago this court held, in Dalton v. Richardson, 43 Ohio St. 652, belonged exclusively to the senate; this is the logic of their position, unless, indeed, resort is to be had to the ever convenient field of assumption, and it is to be assumed in advance, that the certificates of election based upon the returns, shown and discussed in that case, or the temporary admission to seats under them, shall stand as conclusive proof and as clothing the possessors with a title de jure as against all the world. The .query naturally occurs, how it is that-if a court is without power to compel a correct return of an election *393 of a member of the legislature, as was held by a majority in the case above cited, how can it have power to determine thát there was no quorum at a certain time on the ground that some of the members composing it were not elected? The constitution aims to deal with the substance and not with the mere form of an election. The language is “a majority of all the members elected to each house shall constitute a quorum,” not of those who simply hold certificates. So that, if the court try the issue at all it would seem to be its duty to determine the ultimate fact, not which had certificates of election, but which were elected? How else can the court determine as matter of fact that there was or was not a quorum present in the senate when the law passed that branch of the general assembly? To state in different words one of the positions argued in the majority opinion: one not in fact elected, but who has received a certificate of election, may have a statutory claim to sit and act as a member, but he has not a constitutional right to do so. He may, indeed, be a de facto, but he can not be a de jure, member ; and one who has been in fact elected, but who is without a certificate of election, is none the less a member de jure of the body to which he was elected. And it follows, as a corollary, that a majority composed in part of members who have been in fact elected, but, by reason, it may be,.of frauds on the elective franchise, have been deprived of the statutory evidence of an election, is quite as much a quorum, within the spirit and meaning of our constitution, as one composed in part of persons holding only certificates of election. Members having certificates of election, but not in fact elected, though admitted to seats, are simply defacto members; their right to sit and act as members is derived from statute and the practice of legislative assemblies, but not from the constitution. It was as to one of the returns of this same election that the eminent chief justice said, in the opinion in the case above cited, that “ if there was not behind it-and in the preparation of it actual fraud and crime, there was at the best a reckless trifling with official duty, and with the rights of the houest voters of the *394 precinct, as odious as actual fraud, and as dangerous as crime.”
It may not be amiss, in this connection, to suggest that aside from the action of the 8th of May, there appears to have been no determination by the senate of the question which of the contending claimants were elected, and, for that reason, entitled to seats. Acting on the certificates of the clerk, who treated as valid the returns referred to, the contestants had been admitted pending the contest. The question of who were elected had not been passed upon. This action could hardly be deemed a determination of the ultimate rights of contestants and contestees; and, if not, then that question had not been settled unless the determination of May 8th should be recognized. The relators repudiate that action. So that, in the view urged by them, that question would seem to be still an open one. Therefore, upon this view, had the court disregarded the journal and held that whether a quorum was present or not on the 8th was to be determined as a fact, and, like other questions of fact, upon a preponderance of evidence, the court would have had to face that question, and determine upon the evidence who in fact were duly elected and entitled to seats. It would not do to say that the certificates determined that. There is no constitutional sanctity in a certificate of election. Such certificate is at best but a creature of the statute. It is not necessary to here express more decided convictions upon these mooted questions, but the suggestions of this paragraph serve to show what a Pandora’s box would have been opened up had the relators’ claim in regard to the right to introduce evidence to contradict the journal been sustained.
It will be borne in mind that there is no claim made in the reply that at the date of the proceedings attacked by the relators there did not exist a legal senate. The averments of the reply itself, where it speaks of the president of the senate and of certain members of that body, and charges them with forming a conspiracy, necessarily imply that such a body had an existence. There could not be a president of a senate which did not exist; there could not *395 be members of a senate which had no existence. The head and front of the charge, as regards inability to act — leaving out that which is verbiage and high-sounding declaration— is, that less than a quorum was present at the time of the acts complained of. This charge in a pleading necessarily suggests, at the very outset, the question of how the proof in its support shall be made; of how it can legally be made; of what is competent, by way of evidence, for the consideration of the triers. It is the starting point in the case. Any attempt to start elsewhere, or in any other manner, leads inevitably to the placing of the cart before the horse. "We find the statute among those printed in the official volume of session laws of the general assembly. It purports to be one of the laws of the land. It purports to have been, and presumptively was, enacted in a legal and constitutional manner. This presumption stands until it is removed. The relators attack the statute and undertake to remove this presumption. Naturally, then, we ask, how do they propose to do it? The journal of the senate stands squarely across their path. One of the fatal fallacies which attends their argument, by whomsoever put, is to first assume that there was not a quorum present on the given day, and then brush aside the journal as so much waste paper, as the product of a collection of men having no capacity to act. This may be convenient, but it will hardly do.
As we have already seen, for all the purposes of the case, the journal of the senate is before the court; it is precisely as though it were a part of the record in the case, and unless the relators can show either that the journal itself supports their claim, or that they may be permitted to go behind and show by parol evidence, or at least evidence extrinsic of the journal, that their allegations of want of quorum and of conspiracy are true, they must inevitably fail. The first is not pretended. As to the other the logic of the unanswerable argument of the majority opinion is hardly assailed, and not a single adjudicated case is adduced in opposition to the long array marshaled in support of the propositions that the validity of the journal can not be *396 questioned, and that all inquiry into the motives of members of the legislature “ is subversive of the independence of the legislature as a co-ordinate branch of the government,” “ is opposed to the practice and policy of our system of government,” and can not be entered upon. I venture the opinion that those positions are unassailable. Utterly fallacious is the assumption that the legality of public statutes is to be* proven as an issue of fact, and so upon a preponderance of evidence. To hold that a court may go back of a legislative journal and hear parol proof contradicting the truth of its declarations, or contradicting the equally conclusive presumptions which follow, and the presumptions of regularity which attach to it, would involve the absurdity of “ trying the validity of a statute upon the testimony of witnesses; ” would be to hold that the adoption of a law rests upon evidence inferior to that required to attest the leasing or assigning of even the smallest and most uncertain interest in lands or tenements; inferior to that which may support a claim against one to answer for the debt, default, or miscarriage of another; inferior to that necessary to charge an executor or administrator to answer damages out of his own estate ; inferior to that necessary to support an agreement made in consideration of marriage; inferior to that required to negative the presumptions which follow the possession of loaned goods at the expiration of five years; inferior to that required to prove a contract not to be performed within a year. The more one reflects upon such a proposition the more monstrous it appears, and the more peril seems involved in its application. It implies that where the existence or proceedings of a sovereign branch of the government are involved, parol evidence is the best evidence of which the nature of such a case is susceptible; it implies that records of the ordinary and appropriate character to prove public laws, or the existence and .acts of official bodies, whose acts are not doubted or questioned by any other branch of the government, must, by the judiciary be ignored, or subordinated to oral proof. If these implications are to be followed as *397 law, and the courts can ignore the record evidence and official recognition of the present senate, what line would circumscribe the power of the judiciary? With what certainty could the judiciary itself determine upon what the law is ? or what security could the subjects of the government have under and in respect of laws, if their existence and validity were made to depend upon oral evidence ? For what difference in principle can there be between the passage of an act by less than a quorum of a senate whose membership is acknowledged and one a portion of whose membership is disputed? If the journal may be contradicted in the latter case, why may it not in the former ? Public policy requires that the journal itself shall furnish the ultimate, conclusive proof..
Accepting the fallacious theory that the validity of laws may be determined by oral proof, as the rule in every day life would lead to inextricable and interminable confusion. To illustrate: a citizen, squaring the conduct of his business to meet the requirements of a given statute finds himself in litigation. The trial comes on and he seeks to avail himself of the statute. At once his opponent calls a member of the legislature which enacted the law, or a doorkeeper, or a page, or a mere looker-on it may be, who remembers, or assumes to remember, that when the bill was put upon its passage there was less than a quorum present. True, the journal shows that the bill received the requisite number of votes. But the witness remembers that an interloper answered for' an absentee, and thus the record was falsified. Having no oral proof to offer in opposition the party submits. The court, or jury, finds the law invalid, and the citizen loses his case. The next week, in another case, the same law is brought in question. Here no proof is offered to dispute its enactment and it is held valid and declared to be the law of the land. Or, a citizen is one day tried for violating a penal statute. No attack is made on the validity of the act declaring his conduct a crime, and he is found guilty and sent to the penitentiary. The next day, in the same court, a defendant, *398 less scrupulous or more fortunate, shows by a witness that' the act was not duly passed. The same law is, by the same court, held invalid, and the defendant is acquitted. To the legal mind could any thing be more absurd ?
And when a question of conspiracy is being considered, how can such charge be more or less than an attack upon the motives of the several legislators ? Is it any more than a charge of bad motives united in by several impelling to the act? If this may be a subject of judicial inquiry where the validity of the statute itself is involved, why may not every law upon the statute books be in like manner challenged, and why may not the courts of the state be asked to sit eternally and determine, by this test, whether each successive statute involved in trials is valid or not?
The case of Miller v. The State, 3 Ohio St. 476, referred to in both opinions, is of sufficient pertinency, particularly with reference to the proceedings of May 8th, to warrant further reference to it. Especially is the case authority upon the conclusiveness of legislative journals. In the opinion, Thurman, C. J., considers the constitutional provision, in reference to legislative proceedings, that “ every bill shall be fully and distinctly read on three different days, unless, in case of urgency, three-fourths of the house in which it shall be pending shall dispense with the rule.” The plaintiffs in error contended that that section had been disregarded by the assembly in passing the act under consideration, because the bill, having been so changed by amendment as to make it a new bill, had not thereafter been, read on three different days. Concerning this, the learned judge, among other things, says: “Now, in the ease before us, we have no means of knowing what was the change effected by the amendment in question. Neither bill nor amendment is spread upon the journal; and unless we were to run into the absurdity of receiving parol proof and trying the validity of a statute upon the testimony of witnesses, we could not say that any substantial change was made. For aught that we have before us, or can properly look at, the new bill ’ may have been, with the exception of a single *399 word, and that not material, identical with the matter stricken out. Nor is it to be forgotten that every reasonable intendment is to be made in favor of the proceedings of the legislature. It is not to be presumed that the assembly, or either house of it, has violated the constitution. . . . If it be said, as was said in the argument, that this leaves the assembly at liberty to disregard ■the constitution, the answer is obvious, that a disposition to disregard it is no more to be imputed to the legislative than to the judicial department of the government, and ought not to be imputed to either. The members of both departments take an oath to support that instrument, and we are not at liberty to assume that the sense of duty and of the obligation of an oath is weaker in the one than in the other. True, the courts are made the judges in the last resort of the constitutionality of all laws; and, as before remarked, where a statute is on its face plainly unconstitutional, it is their duty so to declare it; but it does not necessarily follow that they are authorized to supervise every step of legislative action, and inquire into the regularity of all legislative proceedings that result in laws.”
In what possible way can this opinion be twisted into an authority supporting the relators’ claim here when the eminent jurist declares the proposition to receive oral proof and try the validity of a statute upon the testimony of witnesses to be an absurdity? And when the very gist of the holding is expressed in the language which, for emphasis, is quoted above in italics, how can it be believed for an instant that Judge Thurman supposed in any ease that as against a legislative journal parol proof could be received ? However much this authority may be misapprehended here, its effect is not misunderstood elsewhere. The' learned judge who delivered the opinion in the case herein-before cited, of Division of Howard County, 15 Kan. 194, cites Miller v. State to the point that legislative journals import absolute verity, and are conclusive proof as to whether any particular law passed the legislature and whether it is valid or not. And, applying Judge Thur *400 man’s words, as quoted in the dissenting opinion to this case, it seems to us that where the journals show that a resolution was adopted, and there is nothing in them to show that there was not a quorum present, the presumption is that there was such quorum; and this presumption is not liable to be rebutted by proof. And, again, where the journals show that a bill was passed, aud that it received the requisite number of votes in its favor, and there is nothing in them to show that those voting were disqualified, the presumption is that they were all qualified, and this presumption is not liable to be rebutted by proof. The judgment in this ■ case was approved by the entire court, composed at the time, beside the chief justice, of Judges Rauney, Bartley, Warden, and Kennon. I have not the means of knowing whether the syllabus was prepared by the court or the reporter, but it is a thorough analysis of the opinion aud judgment, and that which follows is more conclusive, if possible, upon this point than the quotation from the opinion above given. “Por aught that appears in the journals of the senate and house of representatives of the general assembly, the act of May 1, 1854, . . . was constitutionally enacted. . . . Every reasonable intendment is to be made in favor of the proceedings of the legislature. It is not to be presumed that the assembly, or either house of it, has violated the constitution. . . . No bill can become a law without receiving the number of votes required by the constitution, aud if it were found, by an inspection of the legislative journals, that what purports to be a law upon the statute book was not passed by the requisite number of votes, it might possibly be the duty of the courts to treat it as a nullity.” Why limit with such care the question to be tested by the legislative journals if it were not intended to hold that those journals are conclusive, and that no proof in contradiction can be received ? Is there any possible difference in principle as to the proof the court may receive whether the question is as to the presence or not of a quorum, or a question of whether or not the requirements of the constitution have been com *401 plied with regarding the reading of a bill on three different days? In either case the question is one of evidence. Upon this view of the proposed evidence, of what avail would it have been for the court to overrule, the motion, and then, when the testimony should be offered, rule that out ? Should the court be asked to do a vain thing?
McCrary on Elections is referred to, and a portion of section 517 is quoted as sustaining the claim of the relalators. In giving construction to language it is well to observe what the author is talking about. The author in this section is commenting upon the case stated in the preceding section, that of Sykes v. Spencer, pending in the United States senate, where each claimed to be the duly elected senator from Alabama; and, quoting substantially from the author, we find that two bodies had organized, each claiming to be the legislature, and each had elected a senator. The contest between the two legislatures depended upon this: In one body were eight or nine members who had received regular certificates of election, but who were conceded not to have been elected; while in the other was found an equal number of persons duly elected, but without certificates of election. To make a quorum of the former body it was necessary to count the persons holding certificates, but not elected, and to make a quorum of the latter it was necessary to count the members duly elected, but without certificates. The report of the election committee was made by Senator Carpenter, of Wisconsin, and is instructive reading. Following the view urged in the report “that all the forms prescribed by law for canvassing and certifying an election, and for the organization of the two houses, are designed to secure to the persons actually elected the right to act in the offices to which in fact they have been elected, it would be sacrificing the end to the means, were the senate to adhere to the mere form, and thus defeat the end which the forms were intended to secure,” the senate held that the body having a quorum of members in fact duly elected should be regarded *402 as the legislature of the state, and declared Spencer entitled to the seat. It had been contended that the six persons holding certificates should have been regarded as members of the legislature defacto, and their acts as such held valid, and it was in disapproval of this claim that the author (McCrary), uses the language quoted in the dissenting opinion. I fail to see how the citation is authority on that side.
It is urged in support of the claim that the motion to strike out should have been overruled and the proposed testimony admitted, that justice to the presiding officer of the senate and seventeen members of that body, flattered with the designation of “eminent citizens,” required that the relators be called upon to prove the truth of their charges. It is not easy to treat this proposition seriously. If advanced in that spirit, I beg, with due deference, to suggest that the solicitude thus expressed for those “ eminent citizens” is uncalled for, and that sympathy, if due to any of the persons referred to in the reply, belongs to others. However, I have not heretofore supposed that the practice of courts in Ohio warranted the overruling of a motion to strike out irrelevant matter in a reply for the purpose of giving persons not parties to the case the opportunity to call upon the pleader to make good his charges, or to be otherwise heard, although the matter “ gravely involves their official honor.”
Equally misplaced, in my judgment, is the sorrow expressed over an alleged “broken constitution,” and as unauthorized the assumption that this court is, par excellence, the guardian and protector of that sacred instrument. The people are the protectors of their organic law. The legislature, as the direct representative of the people, its members chosen at frequent intervals, is as much its protector as any branch of the government, and it is only when a case is made involving the constitutionality of an act passed by that body, and presented to this court for its adjudication, that the court has any voice in passing upon constit *403 utioual questions connected with legislation. In such case, where it is affirmatively and clearly shown, by competent evidence, that some requirement of the constitution was disregarded in the enactment of the law, or where some provision or provisions of the act violate the constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation in the minds of the court, the act may be declared a nullity ; otherwise the court is clothed with no power to interfere with it. In no other sense- is the court superior to the legislature. Because the court is composed of judges, who are presumed to be more or less learned in the law, it will not answer to assume that it is a body so much purer and so much wiser than the legislature as to warrant undue criticism by it of the acts of that body. ■ This general subject is most ably treated in the opinion of the late learned chief justice of Pennsylvania, in Sharpless v. Mayor, 21 Pa. St. 162, cited in the majority opinion, and lack of space alone prevents extracts from it here.
The case before us involves no question of judicial control of any state officer. No such officer -is asked to do, or not to do, any particular thing or any thing at all. Hence the reference to the language of the eminent judge who dissented in the case of Dalton v. Richardson, supra, has, in my judgment, no application. No one doubts but that where a proper case is made, one bringing an officer within the jurisdiction of the court, the court, operating within limits which the constitution and the laws prescribe, such officer can not claim that he is placed above the restraining authority of the law; but how this principle authorizes scurrilous matter against legislators in a pleading in a suit to which the persons so attacked are not and can not be parties, and in which the matter itself is relevant to no issue which is or can be raised between those who are parties, or is applicable to a question of disregarding or not the legal effect of a legislative journal, or to a-question of the conclusive effect of evidence of the highest character as *404 contrasted with that which is inferior, is entirely beyond my comprehension.
It is alleged that in the action of May 8th the senate disregarded its own rules. When the thing created becomes greater than the creator it maybe worth while to consider this complaint.
It is contended that because quo warranto would not lie to call in question the authority of these so-called “ pretended senators” to act, and because no other form of direct attack is provided, that the present form may be treated as a direct attack, and hence sustainable, upon the principle that where a direct attack upon a proceeding can not, for any reason, be made, it may be collaterally questioned, and Vose v. Morton, 4 Cush. 31, is cited. In this case the owner of land sought to be subjected to the lien of a judgment against his vendor, set up as defense that the judgment was invalid for want of jurisdiction. The judge who delivered the opinion announced as law that “ it is a general and established rule of law that, when a party’s right may be collaterally affected by a judgment, which for any cause is erroneous and void, but which he can not bring a writ of error to reverse, he may, without reversing, prove it so erroneous and void, in any suit, in which its validity is drawn in question,” and, as the law of the case, the court held that “ the tenant in a real action, brought to recover land levied on in execution of a judgment of the circuit court of the United States, in favor of the demandant against a third person, to which judgment such tenant is not a party or privy, is not concluded thereby from showing by proof that the judgment is erroneous and void for want of jurisdiction of the parties.” I think that an examination of this case shows that the principles announced have no application to a case such as that under consideration, and most clearly it is not authority that such attack, whensoever it may be made, can be sustained by incompetent evidence.
In my judgment the conclusions reached by the majority are based upon sound principles; and aiiy departure from *405 them would lead to confusion as to what the law is, uncertainty in its administration, and to other results of a most disastrous character.